[Civ. No. 4002.   Fourth Dist.   Mar. 29, 1950.]

LOUIS SHENSON et al., Appellants, v. FRESNO MEAT PACKING COMPANY et al., Respondents.

Denver C. Peckinpah and L. N. Barber for Appellants.

Matt Goldstein for Respondents.

GRIFFIN, J.—Nine plaintiffs brought this action under nine separate counts.  Each count alleged generally that the particular plaintiff involved was a dealer in buying and selling

livestock and that defendant Fresno Meat Packing Company was and had been from 1941 to 1943, engaged in custom slaughtering for the plaintiff pursuant to an oral agreement whereby defendant agreed to slaughter all cattle delivered to it by plaintiff and to sell all the dressed carcasses at the best available prices; that the expenses were to be borne by defendant company; that defendant guaranteed the collection of the selling price and to account to the plaintiff; that the plaintiff agreed to compensate defendant for its services in the slaughtering and sale of the cattle; that in June, 1943, plaintiff and defendant reduced the oral agreement to writing and thereafter, until 1946, the plaintiff continued to deliver cattle to defendant for custom slaughtering; and that defendant slaughtered and sold the same for the account of plaintiff. This written agreement provides in part as follows:

The defendant is denominated the slaughterer and the plaintiff is called the buyer. (1) "The parties . . . confirm and ratify the arrangement and agreement heretofore existing between them, which arrangement and agreement is hereinafter set forth." (2) "The Buyer . . .agrees to *sell* and deliver to the Slaughterer cattle . . . which the Slaughterer is to process and sell upon the terms hereinafter set forth." (Italics ours.) (3) "The Slaughterer agrees to slaughter all beef . . . delivered to it by the Buyer and out of the selling price thereof the Slaughterer shall have the right to deduct and retain for itself the following:" On beef $3.50 per head, etc., and in addition the slaughterer may retain all offal, consisting of heart, liver, etc. (4) "The Slaughterer agrees to sell all animals slaughtered by it for the best and highest available prices at the sole cost and expense of the Slaughterer, and also agrees to guarantee the collection of the selling price thereof." (5) ". . . to remit to the Buyer the selling price of all animals slaughtered by it, less its charges as herein provided. . . ." (6) "In the event that any beef" so delivered "shall be condemned . . . the Buyer shall receive no reimbursement . . . for such condemned animal." (7) All hides . . . remain the property of the Buyer" and the "Slaughterer agrees to keep regular books of account which shall be subject to the inspection of the Buyer. . . ."

Three of the plaintiffs failed to sign the agreement but continued to deliver cattle to the defendant under the same arrangement. The amended complaint then alleges that from June, 1943, until October, 1946, the Reconstruction Finance Corporation made payments of subsidy for the slaughter of

the cattle pursuant to claims filed by the defendant with the Defense Supplies Corporation; that defendant falsely and fraudulently represented in said claims that all the cattle delivered by plaintiff to defendant were *owned* by defendant at the time of slaughter and that defendant did not kill any cattle belonging to another; that without a showing of ownership defendant was not eligible to claim slaughter payments for the cattle. In this respect it is alleged as a part of the fraud that defendant neglected to inform plaintiff of such ineligibility but did apply, in its own name, for such payments, as *owner*; that as a result, defendant was paid a subsidy by the United States government in excess of two cents per pound; that defendant failed and refused to pay over to plaintiff any amount in excess of two cents per pound, and for this claimed excess plaintiff seeks an accounting.

Defendant denied generally the allegations of the complaint but admitted that each plaintiff *sold* and delivered to defendant the cattle claimed, under and pursuant to the written agreement, which provided that payment therefor should be based on a *dressed weight yield basis,* and that under the written agreement, made a part of the answer, defendant was the lawful owner of the cattle and was entitled to all subsidies paid; that all sums due under the agreement have been paid.

As a separate defense it is alleged that separate monthly statements were rendered to plaintiffs showing all moneys due and that defendant paid said sums in full discharge of any claims made. In another defense defendant claims that in the cause of action attempted to be alleged by each plaintiff, it is shown by his own pleadings that the recovery he seeks to obtain from defendant is for a part of the money received by defendant as a result of a false and fraudulent claim presented by defendant to an agency of the United States government, and that therefore no right of action against defendant accrued to plaintiff because each plaintiff participated therein; that due to the fact that the plaintiffs were *pari criminis,* to render them judgment under these circumstances would be against public policy and in contravention of the statutes therein made and provided.

At the outset it was agreed that the court should first determine if plaintiffs were entitled to an accounting. After hearing their evidence the court granted a nonsuit. From the judgment of dismissal based thereon plaintiffs appeal.

It is conceded that if the relationship between the

plaintiffs and defendants was that of seller and buyer, and defendants were the lawful owners of the cattle at the time the application was made, plaintiffs cannot recover. Plaintiffs, in their brief, state that although the evidence is sufficient to show that the written contracts defining the relationship between the parties were obtained by the fraud of the defendants, plaintiffs have chosen not to attack these written agreements upon that ground, but rely upon the testimony surrounding the execution of those agreements as evidence supporting their interpretation of the contracts and establishing therefrom that the relationship of principal and agent only existed.

It should be here noted that the contract provides definitely that ''The Buyer agrees to sell and deliver to the Slaughterer cattle'' etc. The sales slips filled out by defendants, and delivered to the several plaintiffs at the time they delivered the meat showed ''bought of'' the particular plaintiff named, and ''sold to Fresno Meat Packing Company,'' giving the date. Opposite the description of the meat and its weight, is the notation ''Dressed weight yield basis.'' When plaintiffs delivered the cattle to defendant a bill of sale for said cattle was also furnished. This evidence rather conclusively shows that the defendant became the owner of the cattle at that time. It is plaintiffs' contention that the remaining portion of the written agreement, as well as the oral testimony of the several plaintiffs, indicate that it was not the intention of the plaintiffs to part with ownership of the cattle at that time but it was clearly intended that defendant was only acting as agent for them, as owners, in butchering and selling the beef. In connection with this construction testimony was taken of the several plaintiffs. The general purport of their testimony is in accordance with the testimony of plaintiff Shenson, which is as follows:

He stated that he was a livestock dealer and would go out in the country and buy cows and bring them to defendant's plant, furnish a bill of sale showing that the cattle belonged to him and that they were then slaughtered and sold by defendant and that he was then paid the sale price less a killing charge which was deducted therefrom; that in case a cow was condemned as unfit for consumption he was paid nothing and he was charged for its killing; that in some years he sold cattle to defendant outright; that in 1943, he was restricted as to the amount of cattle that he could bring in; that in June, 1943, he signed a paper at the request of the manager of

defendant company, who told him that in order for the company to kill, the O.P.A. required that it have plaintiff's quota; that he did not read the agreement but asked if the other buyers had signed it; that when he was informed that the others had signed it he signed the agreement and that there was no change in the way he continued to do business with the defendant except that about 60 days after he started under the written agreement he received a subsidy of two cents a pound, dressed weight, retroactive to June 1, 1943; that he had a conversation with the manager at defendant's plant and he was told that the plaintiffs would obtain the subsidy; that he only received two cents per pound subsidy and he asked the defendant's manager if he could not take his cattle to another slaughter house because he believed he could obtain a greater amount; that the manager told him he was welcome to go but that his quota stayed there; that he showed him where defendant company was receiving $16.50 subsidy from the government based on live weight, whereas, he was only receiving $9.00 on the same animal in dressed weight. The witness testified that he knew that in order for him to kill cattle or have the cattle killed and to sell the meat he had to have a quota; that he did not know that he had to have a license from the Office of Food Administration for this purpose. Another plaintiff testified that defendant told him that it was not necessary for him to have a killing license because they could kill his cattle on their license, and therefore he did not take out any license.

Under the evidence it is shown that the Reconstruction Finance Corporation would not have made any payment upon a claim for subsidy unless there was proper certification that the slaughterer, at the time, had ownership of the cattle.

Under plaintiffs' pleadings and the evidence offered by them, if true, no other conclusion could be reached except the one that defendant was guilty of fraud in presenting a false and fraudulent claim to the government by fraudulently claiming that the defendant was the *owner* of the cattle slaughtered. The presentation of such a fraudulent claim is a felony under the Federal Criminal Code, section 35, as amended. (35 Stats. 555, 18 U.S.C.A. § 80.) It is fundamental that money stolen from the government through fraud might be recovered by the government when such money is in the hands of the thief, but the trial court in this action would have no authority to award it to a third party not connected with the transaction or to order it distributed in an

accounting proceeding between the wrongdoers. In *Butler* v. *Agnew,* 9 Cal.App. 327, at page 332 [99 P. 395], it is said:

"The test whether a demand which is connected with an illegal transaction may be enforced at law is: Does the plaintiff require the aid of the illegal transaction to establish his case? If the plaintiff cannot prove his case without showing that he has broken the law, the court will not assist him, whatever the justice of his claim against the defendant." (See, also, 3 C.J.S. § 183, p. 79.)

It is apparent that plaintiffs required the aid of the illegal transaction here involved to establish their case. They could not recover in their own names against the government if the government failed or refused to pay the subsidy for several reasons. First, they, in their own names, were not qualified to receive this subsidy; and secondly, in order for anyone to have qualified to receive a subsidy payment legally, he had to comply with certain requirements. Under Restriction Order 1, and Food Distribution Order 27 (8 Federal Register 2785, March 6, 1943), one had to first obtain a quota and secure a license before he could slaughter cattle during the war period because the government was interested in limiting the amount of cattle that could be slaughtered, and the persons eligible for payment were those who secured a quota and license thereunder and who slaughtered 4,000 pounds or more of livestock in one established calendar month after May, 1943. It must be shown that such applicants kept records thereof for two years. The order then provides: "No person who kills livestock for the account of others is eligible to file application for payment on account of such livestock." Plaintiffs were not slaughterers. Before they could slaughter for themselves they had to have a valid and effective permit at the time of such slaughter. (8 Federal Register Mar. 6, 1943, p. 2785, et seq.) Under subdivision 2 thereof no such permits would be issued until the applicant had filed an application on the form approved by the director containing the information required. None of the plaintiffs had obtained such a permit. Two or three of them endeavored to obtain one and the permits obtained were defective for failure of the applicant to comply with the requirements and they were warned that the permits had been canceled and were not to be used. Plaintiffs had no sufficient quotas required of slaughterers, a prerequisite to the obtaining of any subsidy, and it would have been a violation of law on their part to slaughter cattle without a permit. Assignment of a right to a subsidy was prohibited. The evi-

dence clearly shows that plaintiffs, by reason of these facts, joined with defendant, a duly licensed slaughterer, who qualified for a permit under the combined quotas of all of the plaintiffs, representing that defendant was the owner of the cattle and the quotas, apparently for the purpose of qualifying and jointly obtaining the subsidy. If true, this was an illegal transaction and one upon which plaintiffs must rely for a recovery. It was conceded at the trial that plaintiffs were ineligible to collect subsidies in their own names, and under the regulations the government was precluded from making any payments of subsidies to the plaintiffs herein. To now grant these plaintiffs the relief that they seek would be to enable them to do indirectly that which they could not do directly. It is the rule that a party is forbidden to do indirectly that which he is forbidden to do directly. (*Hunter* v. *Superior Court*, 36 Cal.App.2d 100, 109 [97 P.2d 492].)

With certain exceptions, the general rule is stated to be that where two or more have entered into a fraudulent scheme for the purpose of obtaining property in which all are to share, and the scheme has been carried out so that all of the results of the fraud are in the hands of the parties, a court of equity will not interfere on behalf of the others to aid them in obtaining their shares but will leave the parties in the position in which they have placed themselves. In *Wise* v. *Radis*, 74 Cal.App. 765 [242 P. 90], two real estate brokers, one licensed and the other unlicensed, brought an action in accounting to divide commissions paid to the one broker who was licensed. The court denied the unlicensed broker a recovery, and said, at page 775 et seq.:

"No principle of law is better settled than that a party to an illegal contract or an illegal transaction cannot come into a court of law and ask it to carry out the illegal contract or to enforce rights arising out of the illegal transaction. He cannot set up a case in which he necessarily must disclose the illegal contract or the illegal transaction as the basis of his claim. . . . Respondent's cause of action grows directly out of this illegal contract between himself and appellant. Only through it and by proving it can he get at his share of the commission." To the same effect are *Firpo* v. *Murphy*, 72 Cal.App. 249 [236 P. 968]; *Sheble* v. *Turner*, 46 Cal.App.2d 762 [117 P.2d 23]; *Lucientes* v. *Bartholomae Oil Corp.*, 64 Cal.App.2d 443 [149 P.2d 28].

Plaintiffs seek to avoid this general rule and its effect upon

this transaction by claiming that the accounting here sought is predicated upon the theory of principal and agent. They claim that in collecting the subsidy from the government, the defendants were acting as their agents and that it follows that the defendants were under the obligation of serving the interests of the plaintiffs with undivided loyalty and the highest good faith; that a fiduciary relationship existed between them and that if the agent received a benefit as a result of violating his duty of loyalty, the principal is entitled to recover from him what he has received, citing Restatement of the Law of Agency, section 407; and that profits made and advantages gained by an agent in the execution of his agency belong to the principal, citing 2 American Jurisprudence, section 268, page 215. They further claim that when money or property has been actually paid or delivered to an agent for his principal, it is usually held that the latter may recover such money or property from the agent, although it was received by the agent as the fruits of an illegal contract or transaction, citing 2 Corpus Juris 746.

In Restatement of the Law of Agency, section 412, this general rule is stated, together with the exceptions there noted. One of the exceptions is that "An agent who has received the proceeds or profits of an act committed by him on behalf of and at the direction of the principal and for which the principal is criminally responsible is under no duty to deliver them to the principal if the crime is more than a minor offense." If the defendant was acting as agent for the plaintiffs, as established, plaintiffs were presenting false claims to the government because, they, as plaintiffs, were not entitled to the subsidy. It cannot be said that the punishment for the filing of such a claim was for a minor offense. The penalty provided is for a fine of not more than $10,000, or imprisonment for not more than 10 years, or both. (18 U.S.C.A. § 80.) It is highly improbable to believe that if the United States government brought an action against the defendant for a violation of this section, or to seek a return of the subsidies paid, plaintiffs would therein contend, as they do now, that the defendant was acting as their agent in making such false claim.

We are foreclosed, by the order granting a nonsuit, of the benefit of a finding on the question of knowledge of plaintiffs of the illegality of the contract and whether they acted *in pari delicto* with the defendants in securing the subsidy in which they shared with the defendants for a period exceeding 40 months.

In *Firpo* v. *Murphy,* 72 Cal.App. 249, it was said, at page 253 [236 P. 968] : "that whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case."

Reduced to a simple statement, plaintiffs' evidence in this case shows that the principals, the plaintiffs, who were themselves ineligible to collect a subsidy payment, sought to profit by the alleged fraudulent act of their agent, if such, and to obtain an accounting of moneys which the agent collected for the ineligible principal by fraudulent and illegal means. The mere statement of the position in which plaintiffs find themselves furnishes a complete answer to their claim for an accounting, under this theory. The prime purpose of the regulations was to prevent unlicensed, ineligible and unqualified persons from engaging in the slaughter of livestock during the war. Its further purpose was to keep slaughter under close governmental supervision and control. The subsidy was paid to those only who were legitimately engaged in the slaughtering business and who placed themselves under the supervision and control of the governmental agencies. No other persons were permitted to obtain payment of such subsidies. An interpretation which would make lawbreakers of the parties to the transaction should be rejected if there is another possible and reasonable interpretation, as there unquestionably is in this case. (*Shelley* v. *Byers,* 73 Cal.App. 44, 57 [238 P. 177].) Plaintiffs should not now prevail in obtaining benefits from their own wrong and their own noncompliance with the regulations in an action for accounting.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.