**POLLAND & COOK, Appellant,**

v.

**Jeffrey A. LEHMANN and Jeffrey A. Lehmann & Associates, Appellees.**

**No. 01–90–01099–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

June 11, 1992.

Rehearing Denied July 16, 1992.

**730**

W. Troy McKinney, Houston, for appellant.

Joe H. Reynolds, Houston, for appellees.

Before DUNN, DUGGAN and O'CONNOR, JJ.

## OPINION

DUNN, Justice.

This is an appeal from a take-nothing judgment in a suit for the recovery of attorney referral fees. The law firm of Polland & Cook (Polland) filed suit against Jeffrey A. Lehmann, individually, and Jeffrey A. Lehmann & Associates (collectively, Lehmann), for breach of contract, breach of partnership agreement or special relation, and breach of fiduciary relationship. Trial was to the court without a jury, and the court entered judgment that Polland take nothing against Lehmann.

### Summary of the Facts

Polland was counsel for Major Funding Corporation (MFC), a debtor-in-possession in a Chapter 11 liquidation bankruptcy. Quorum Management Corporation (Quorum) had advised several hundred people to invest in MFC projects through Quorum, and the MFC bankruptcy put those investments at risk. Quorum asked Polland to represent the investors in the MFC bankruptcy. Because of a potential conflict of interest, Polland told Quorum that his firm could not represent the investors, but he offered to refer Quorum to another lawyer.

In March of 1987, Polland had a telephone conversation with Lehmann about representing the MFC investors. Polland told Lehmann that Quorum wanted to find a law firm to represent 200 to 500 of the individual investors of MFC. Polland generally discussed a referral fee with Lehmann at this time. Lehmann indicated to Polland that he "would be willing to pay a referral fee for the referral of that kind of business."

On March 19, 1987, Quorum wrote to the investors and told them about the pending litigation, that it had contacted Lehmann to represent them in the MFC bankruptcy, and informed them about the shared costs for the litigation. If the investors wanted to be included in the suit, Quorum asked them to sign and return an enclosed power of attorney form designating Quorum "as your liaison and representative," and to send a check to Quorum made payable to "Quorum Management Corp., Trustee/Attorney's Fund." Fees were calculated on how much each investor was owed by MFC. Polland drafted both the Quorum letter to the investors and the power of attorney for them to sign. Quorum collected legal fees from individual investors and sent the powers of attorney and checks to Polland, who copied them and sent them on to Lehmann.

Quorum ultimately referred 279 investors to Lehmann as clients.

On March 22, 1987, Rick Bachman, president of Quorum, consented in writing by letter addressed to Lehmann to the referral fee to be paid by Lehmann to Polland. At trial, Lehmann testified that he was not contesting that Quorum had the authority to hire and retain him on behalf of the investors. He also stated that representatives of Quorum knew about and had consented to the referral fee agreement.

In April of 1987, Polland met with Lehmann and David Cook, Polland's partner, and Quorum's representative regarding Lehmann's representation of, at that time, the unidentified investors. At this first meeting, Quorum's representative told Lehmann that Quorum wanted motions for relief from the stay filed for the investors so they could get their property out from under the bankruptcy. Lehmann responded that it was not a problem "if Major Funding and their attorneys (Polland) are cooperating with me in that score." Polland confirmed that he would not oppose the motions to lift the stay as long as their paperwork checked out. At the meeting, Quorum's representative voiced strong opposition to the appointment of a bankruptcy trustee for MFC. Those present generally discussed their strategy regarding the bankruptcy from the perspective of MFC and the investors. Polland also discussed a referral fee with Lehmann, and Lehmann consented, with reservations, to a fee split. Lehmann wanted the fees from the investors to reach a minimum amount of $100,000 before he would pay a referral fee. Lehmann refused to sign the documents drafted by Polland that guaranteed a one-third referral fee to Polland.

On April 13, 1987, Lehmann sent Quorum a letter stating that Lehmann had filed a motion to modify the stay on behalf of investors who had paid portions of agreed attorney's fees and that Lehmann intended to file, for these investors, a motion to lift stay in the bankruptcy proceeding. Lehmann said he would not undertake any other litigation on behalf of the investors until the investors paid the full amount owed in fees. The investors paid attorney's fees to Lehmann through Quorum. Once monies were received, Lehmann deposited the funds in a trust account.

From the time of the initial meeting with Lehmann, Polland had not been able to reach Lehmann, who did not return his calls. In late April, Polland called Lehmann and told him he had a check for $20,000 from the investors and that he wanted to meet with Lehmann to discuss the referral fee. On April 23, 1987, Polland and Lehmann met to discuss the fee agreement. Polland told Lehmann that if they could not agree to the one-third referral fee, Polland would send the investors to other counsel. Lehmann said his only concern was compensation for expenses. Polland agreed to modify the agreement to take care of Lehmann's concerns and Lehmann added some handwritten language to the agreement, shown below as underlined. Polland testified Lehmann did not express any concerns about the propriety of the referral agreement at that meeting. Lehmann testified that, at the time he signed the agreement, it was his intention to pay a referral fee and that he, as well as Polland, intended for the agreement to be effective.

As modified by Lehmann, the referral fee agreement between the parties (plaintiff's exhibit one), states:

THIS AGREEMENT, between the law firm of Polland & Cook, hereinafter referred to as "FORWARDING ATTORNEYS" and Jeffrey A. Lehmann of Lehmann & Associates, hereinafter referred to as "ATTORNEY OF RECORD," is entered into this 23d day of April, 1987. As consideration for FORWARDING ATTORNEYS furnishing ATTORNEY OF RECORD with the clientele consisting of numerous investors with Major Funding Corporation who wish to pursue a cause of action against the State of Texas, the ATTORNEY OF RECORD herein agrees to compensate the FORWARDING ATTORNEYS by paying a sum equal to one-third (⅓) of fees to be collected from all said clientele for the contemplated legal action. *All funds re-*

*ceived will be placed in the trust account of Jeffrey A. Lehmann, Tr untl [sic] $150,000 from this or other groups referred is placed in there in the name of Quorum Management Corp. Trustee & it will then be disbursed. Should the total not be reached the parties will meet and determine the referral fee by mutual agreement.*

All parties to this agreement acknowledge that the total fee charged the clientele shall not exceed reasonable compensation for all legal services which are rendered on their behalf; and that this division of fees between the FORWARDING ATTORNEYS and the ATTORNEY OF RECORD complies with the requirements and restrictions as set forth in Disciplinary Rule 2–107 of the Texas Code of Professional Responsibility.

Quorum Management Corp., the Trustees for the clientele by and through President Rich [sic] Bachman or Vice–President Tommy Knight, acting within their authority and on behalf of the numerous clientele and acting with a power of attorney executed by the clientele have consented to the employment of the ATTORNEY OF RECORD after full disclosure and with knowledge that a division of fees will be made with the FORWARDING ATTORNEYS. A true and correct copy of a letter of acknowledgment from the President of Trustee is attached to this Agreement as Exhibit "A."

It is agreed and understood by the undersigned parties that the FORWARDING ATTORNEYS shall be entitled to receipt and retention of the retainer fees immediately when paid by the clientele or their Trustees.

Both parties acknowledge that the terms and conditions of this Agreement have been read and are fully understood and that no other agreements, written or oral, shall be part of this Agreement.

After signing the agreement, Polland handed Lehmann the check for $20,000. The lawyers then discussed strategy for getting the stay lifted. Polland testified that:

I told Mr. Lehmann as well as Mr. Knight [a representative of Quorum] as did Mr. Crosby [a representative of MFC] that we would expedite the process. Let's get them filed and we will respond quickly, give you agreed orders quickly so you can get those people gone, for getting the check out and Mr. Crosby was going to get the paperwork that we were looking for seeing, so we wouldn't have to wait for the motions to be filed then look at the motions. We were going to try to do those contemporaneously.

In response to the question, "Was there to be some coordination between you and debtor's counsel and Mr. Lehmann as counsel for the investors?," Polland responded:

Coordination to the extent that once Mr. Lehmann got his paperwork filed, we are going to get agreed orders quickly because we had already had Mr. Crosby review the paperwork to make sure that everything checked out. If there was a problem with the paperwork, of course, we would get that information quickly back to Quorum and to Mr. Lehmann....

Lehmann met with the individual investors, set up individual files on the investors, and filed additional pleadings on their behalf. On May 21, 1987, Lehmann filed a massive motion for modification of the stay on behalf of the investors.

After the April 23 meeting, Polland again had trouble reaching Lehmann. Finally, on June 2, 1987, Polland and Lehmann agreed to meet at Polland's office to discuss the referral fee and joint strategy to oppose the appointment of a bankruptcy trustee. By that date, Lehmann had accumulated over $100,000 in the trust account. Minutes before the scheduled meeting, Lehmann delivered a letter to Polland asserting that the referral agreement raised problems under the State Bar Rules of Professional Responsibility, including the requirement under rule DR 2–107 that the fee-splitting arrangement be disclosed to the client. The letter noted that the true clients under the agreement were the investors, not Quorum. Lehmann contended that full disclosure of the fee-split to all the

investors must, therefore, be made. Lehmann noted that he never intended the agreement as a subterfuge to the ethical considerations and did not intend to violate the disciplinary rules. He stated, "As such, we feel that the Referral Agreement was improvidently entered into and must be void ab initio for a mutual mistake or illegality."

On June 10, 1987, Polland sent Lehmann a demand letter, which stated:

In accordance with DR 2–107(A), the individual investors who became your clients are the very people to whom a full disclosure must be made by your firm and their informed consent obtained. It is my recommendation that the resolution to the problems as set forth in your letter may be easily remedied by your firm's compliance with the disclosure requirements to any of your clients who have not been so informed and having obtained the consent of these individuals, the disbursement of the sum of TWENTY–FIVE THOUSAND AND NO/DOLLARS ($25,000.00) from your trust fund to this firm in order to fulfill the contractual obligation which this firm undertook with you in good faith in this matter.

On July 21, 1987, Cook, Polland's partner, sent another demand letter that gave Lehmann until July 31, 1987, to meet and resolve the fee dispute. Lehmann refused to meet with Polland and Cook, and the lawsuit that is the subject of this appeal was filed.

## Standard of Review

■■■ Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict upon special issues. *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). Findings of fact are not conclusive, however, when a complete statement of facts appears in the record. *Middleton v. Kawasaki Steel Co.*,

687 S.W.2d 42, 44 (Tex.App.—Houston [14th Dist.] 1985, *writ ref'd n.r.e. per curiam*, 699 S.W.2d 199 (Tex.1985); *Stephenson v. Perlitz*, 537 S.W.2d 287, 289 (Tex. Civ.App.—Beaumont 1976, writ ref'd n.r.e.). When we review a record from a non-jury trial that contains both findings of fact and the statement of facts, we will sustain the findings if there is any evidence to support them. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). If the evidence supports the findings of fact, we then review the conclusions of law to determine if they are correct. *NCL Studs, Inc. v. Jandl*, 792 S.W.2d 182, 187 (Tex.App.—Houston [1st Dist.] 1990, writ denied).

■■■ The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them. *Mercer*, 715 S.W.2d at 697. We use the same standards to review the legal or factual sufficiency of the evidence to support a jury's answer to a jury question as we do to review the findings of fact. *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.). Although a trial court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Mercer*, 715 S.W.2d at 697.

## Disciplinary Rules

In points of error one through eight, Polland claims that the trial court erred in holding that DR 2–107 provided a substantive defense to the referral agreement and in finding that the referral fee agreement was illegal. He contends that Lehmann's illegality defense, and the trial court's finding thereon, is based on the premise that the referral fee agreement is illegal because there was not full disclosure to the investors that a division of fees would be made and, thus, the agreement violated DR 2–107.[1]

1. Appellant complains of the following findings by the trial court:

(5) A company known as Quorum Management Corp. of Dallas, Texas, contacted Plaintiff with the desire to have Plaintiff assist

them in finding legal representation for some investors in Major Funding Corporation who is a debtor in bankruptcy in United States Bankruptcy Court for the Southern District Court of Texas. Quorum Management told

To resolve these points of error, we must look to the disciplinary rules that govern attorney conduct. Polland, as the forwarding attorney, asks us to apply rule 1.04(f) from the new disciplinary rules, which went into effect on January 1, 1990. Lehmann, the lawyer to whom the cases were referred, asks us to apply DR 2-107 from the old disciplinary rules, the ones that were in effect at the time they agreed to split fees and tried the lawsuit. Both DR 2-107 and rule 1.04(f) involve the obligations of the referring lawyer. DR 2-107 was amended and is now rule 1.04(f) in the current disciplinary rules.

DR 2-107, the old rule, provides:

(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:

(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

(2) The division is made in proportion to the services performed and responsibility assumed by each, or is made with a forwarding lawyer.

(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

(B) This Disciplinary Rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.

---

Plaintiff that it had between 300 and 500 investors in Major Funding Corporation that had legal rights that need protection. Plaintiff told Quorum Management that it would assist in locating suitable counsel for them. (9) It is a fact that Quorum Management Corp. did solicit investors in Major Funding Corporation to join in a litigation effort against Major Funding Corp. for a one-time charge of $150,000.00 in total attorney fees to be paid to Defendants.

(13) The letter dated March 22, 1987, from Rick Bachman, President of Quorum Management Corp., attached and made a part of Exhibit 1 in evidence, purporting to acknowledge and consent to a referral fee paid by Defendants to Plaintiffs was received by Defendants.

(14) There is no evidence that Quorum Management Corp., by and through its officers or employees, had authority to consent to the proposed division of fees on behalf of the 279 investors which Defendants represented.

(15) Disciplinary Rule 2-107 of the State Bar Rules, Article 10, § 9 (Code of Professional Responsibility in effect at the relevant times of this transaction) states that a lawyer shall not divide a fee with another lawyer not of his office without client consent after a full disclosure that a division of fees will be made. Plaintiff has contended that Quorum Management Corp. is the Defendants' client and, therefore, can consent and authorize a division of fees under Disciplinary Rule 2-107 under the former Code of Professional Responsibility. The Court finds that a "client" is a person, corporation, association or other organization or entity who is rendered professional legal services by a lawyer with a view to obtain professional legal services from him. This Court finds that the persons or entities who were rendered professional legal services by the Defendants are the 279 investors in Major Funding Corporation who have appeared of record in the United States Bankruptcy Court represented by the Defendants. Although channeled through Quorum Management Corp., the investors alone paid the attorney's fees to the Defendants, and the investors alone had interests to be protected in the litigation filed by the Defendants. From the evidence admitted in this case, it was known all along that the investors would be the intended beneficiaries of the Defendant's legal services, not Quorum Management Corp. Quorum Management Corp. was not the client of the Defendants and could not acknowledge and consent to a division of fees between Plaintiff and the Defendants.

(16) Plaintiff never gave written or verbal notice or disclosure of the proposed referral fee between the parties to the 279 investors in Major Funding Corporation who were rendered legal services by the Defendants.

(17) Defendants never gave written or verbal notice or disclosure of the proposed referral fee between the parties to 279 investors in Major Funding Corporation that they represented.

(18) There was no disclosure to the 279 investors/clients of the proposed fee division between Plaintiff and Defendants. Without that disclosure and consent, all conditions precedent to a recovery by Plaintiff have not been accomplished, and Plaintiff cannot enforce its claim against the Defendants. The burden to obtain the consent of the client is on the party seeking to enforce the proposed referral fee. *Lemond v. Jamail,* 763 S.W.2d 910 (Tex.Civ. [sic] App.—Houston [1st Dist.] 1988, writ denied). *Fleming v. Campbell,* 537 S.W.2d 118 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.).

(22) There was no evidence admitted that Quorum Management Corp., was the trustee of or for the investor-clients with powers under the Texas Trust Act.

SUPREME COURT OF TEXAS, CODE OF PROFESSIONAL RESPONSIBILITY, DR 2–107(A)(1) (1982).

Rule 1.04(f), the new rule, provides:

(f) A division or agreement for a division of a fee between lawyers who are not in the same firm shall not be made unless:

(1) the division is:

(i) in proportion to the professional services performed by each lawyer;

(ii) made with a forwarding lawyer; or

(iii) made by written agreement with the client, with a lawyer who assumes joint responsibility for the representation;

(2) *the client is advised of and does not object to the participation of all the lawyers involved;* and

(3) the aggregate fee does not violate paragraph (a).

SUPREME COURT OF TEXAS, STATE BAR RULES art. X, § 9 (Texas Disciplinary Rules of Professional Conduct) Rule 1.04(f) (1992) [TEX. DISCIPLINARY RULES OF PROF. CONDUCT] (located in the pocket part for Volume 3 of the Texas Government Code in title 2, subtitle G app., following § 83.006 of the Government Code) (emphasis added).

■ There are some significant differences between the two rules. Under DR 2–107, the lawyer must make a full disclosure to the client that he intends to divide the legal fees.[2] Next, the client must consent to employment after disclosure of the arrangement. Rule 1.04 does not require, as does DR 2–107, that an attorney disclose that he intends to divide the legal fees and that he obtain the client's consent. If a lawyer acts as a forwarding attorney, under rule 1.04(f), the client need only be advised of and not object to the "participation" of all the lawyers involved. We

will apply the standard set forth in DR 2–107, as the new Texas Disciplinary Rules of Professional Conduct were not in effect at the time the agreement was executed.

■ Polland initially maintains that the disciplinary rules were adopted to govern professional conduct and not to provide a private cause of action or a defense.[3] Our review of applicable case law shows that a court may use the disciplinary rules to determine whether a contract is contrary to public policy. *Lemond v. Jamail,* 763 S.W.2d 910, 914 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Kuhn, Collins & Rash v. Reynolds,* 614 S.W.2d 854 (Tex.Civ. App.—Texarkana 1981, writ ref'd n.r.e.); *Fleming v. Campbell,* 537 S.W.2d 118, 119 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). If the contract has not been performed in accordance with requisites set forth in the disciplinary rules, performance may be excused as against public policy. RESTATEMENT (SECOND) OF CONTRACTS § 181 (1979).

In the case of *Fleming v. Campbell,* 537 S.W.2d at 119, the court of appeals concluded that an oral promise to pay a referral fee was, as a matter of law, against the public policy expressed in Disciplinary Rule 2–107, because the client's consent was not obtained after full disclosure of a fee-splitting arrangement. Because the referral fee violated public policy, the court held the contract was void and unenforceable. *Id.*

There are a number of important distinctions between the facts in this case and *Fleming* and *Lemond.* Here, the referral contract was in writing; in *Fleming,* the client was referred for a second opinion, and no mention was made of a referral fee. The lawyer later called the first lawyer and

**2.** We note that DR 2–107 does not specify which lawyer has the burden to disclose to and obtain consent from the client.

**3.** Section 15 of the preamble to the TEX. DISCIPLINARY RULES OF PROF. CONDUCT discourages the use of the Disciplinary Rules as procedural weapons in other proceedings. It states:

These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does

it create any presumption that a legal duty to a client has been breached. Likewise, these rules are not designed to be standards for procedural decisions. Furthermore, the purpose of these rules can be abused when they are invoked by opposing parties as procedural weapons.... Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

orally committed to payment of a fee. Here, the lawyer who handled the case agreed that he had committed to pay the fee; in *Fleming* and *Lemond,* the lawyers who handled the case did not agree that they had agreed to pay a fee. Here, the issue of informing the client arose before the litigation was terminated, when the clients could have been asked for their consent[4]; in *Fleming* and *Lemond,* the referring lawyers made the claim for a fee after the end of the litigation, when it was too late to ask the clients.

### Conflict of Interest

■ We note that Lehmann claims that Polland had "a premeditated, deep and extended involvement all for the purpose of trying to do indirectly what [he] was forbidden to do directly—get a fee for representing investors with interests directly adverse to its existing client, MFC." Our reading of the Code of Professional Responsibility leads us to conclude that Polland's actions as a forwarding attorney did not rise to the level of a conflict of interest regarding the investors.[5]

Our review of the record reveals that Polland was retained by the investors solely for the purpose of obtaining legal representation for them. We find no evidence in the record to indicate that Polland, either directly or indirectly, undertook to either interfere with Lehmann's representation of the investors or collude with Lehmann regarding legal advice about the merits of the investors' claims. We find no evidence of fraud or double-dealing on Polland's part. Indeed, Polland undertook to obtain Lehmann's services for the investors, through Quorum. Polland, in fact, had no attorney-client relationship with the investors, which would reach the merits of their claims, nor did he undertake to render legal services, other than hiring Lehmann, to the investors. He merely served in the capacity of a forwarding attorney to obtain legal

services and representation for the investors. He was to be paid, under the terms of the agreement, a referral fee for his services in finding legal counsel for the investors, not for rendering legal advice regarding the merits of the investors' claims.

The dissent claims Polland and Lehmann could not legally be "partners" in the bankruptcy action. We agree; however, we find that the only contemplated act under the agreement was Polland's forwarding of names of investors to Lehmann in exchange for a referral fee from Lehmann. We also agree with the dissent that a lawyer cannot represent opposing parties to the same litigation; however, Polland never colluded with Lehmann nor intended to represent both parties.

In the present case, we hold that there was no actual or apparent conflict of interest on Polland's part. He received no remuneration for rendering legal assistance to the investors concerning the merits of their claims. Polland was to be paid for finding an attorney for the investors, which he did. As such, there was no conflict of interest on Polland's part.

### Scope of Authority

The dissent also maintains that a client has a right to know the nature and the basis of the representation. We note that a client may also choose to delegate this authority to another, as was done by the investors in allowing Quorum to retain Lehmann on their behalf.

Under the present facts, the issue before this Court is whether the authority given to Quorum by the investors to retain counsel, to agree to a fee with counsel, and to negotiate a fee with counsel carried with it the authority to consent to the referral agreement. Polland contends that Quorum, acting on behalf of the clients, agreed to the referral fee. Lehmann contends

---

**4.** *See supra* note 2.

**5.** Supreme Court of Texas, Code of Professional Responsibility, Canons 4, 9 (1982). *See also* Supreme Court of Texas, State Bar Rules art. X, § 9 (Texas Disciplinary Rules of Professional Con-

duct) Rules 1.05–1.09 (1992) [Tex. Disciplinary Rules of Prof. Conduct] (located in the pocket part for Volume 3 of the Texas Government Code in title 2, subtitle G app., following § 83.-006 of the Government Code).

that Quorum was not the actual client and could not consent on their behalf to a referral fee.

The record shows that Cook, Polland's partner, testified that Quorum was given authority by the investors to hire an attorney. He stated that many of the investors did not have the time or the inclination to shop for a lawyer to try to preserve their position in connection with the bankruptcy litigation. Cook stated that the primary reason for pooling the investors through Quorum was that there were too many individuals and "if left to their own devices would probably not be able to obtain satisfactory legal representation to represent their interest in the matter." Polland testified that the individual investors "have signed powers of attorney giving authority over to Quorum to handle their matters and handle their matters through us by hiring Mr. Lehmann...." The record also reflects that the fee charged each investor was not in any way affected by the fee-split, as the fee was determined by how much the individual invested in MFC.

■ A principal may confer actual authority upon an agent, either expressly or by implication. *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 847 (Tex.App.— Houston [1st Dist.] 1984, writ ref'd n.r.e.). The term "actual authority" denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess. The term includes both express and implied authority. *Behring Int'l, Inc. v. Greater Houston Bank*, 662 S.W.2d 642, 649 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd w.o.j.). Implied authority means the authority to do all things proper, usual, and necessary to exercise any authority granted to a person. *Duval County Ranch Co. v. Wooldridge*, 674 S.W.2d 332, 334 (Tex. App.—Austin 1984, no writ). An agent's authority is presumed to be coextensive with the business entrusted to his care. *Boyd v. Leasing Assoc., Inc.*, 516 S.W.2d 485, 491 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). He may perform such acts as are necessary and proper to accomplish the purpose for which the agen-

cy was created. *Houston Packing Co. v. Spivey*, 333 S.W.2d 423, 426 (Tex.Civ.App. 1960, no writ).

■ The underlying facts of the transaction are undisputed. There is no question that Quorum had the express power and authority to retain, employ, and agree to compensate attorneys on behalf of the individual investors. There is no evidence in the record that any of the individual investors expressly refused to consent to the proposed referral fee agreement; therefore, the only question for resolution by the trial court was a question of law— whether the power expressly given to Quorum by the 279 individual investors carried with it the implied power to consent to a division of the fees.

■ In this case, on these facts, we agree with Polland that Quorum had authority to consent on behalf of the investors to whatever attorney-client arrangement was made on behalf of the investors, including the fee-split agreement or other means of securing an attorney. Therefore, disclosure to and consent from Quorum was legally effective as to the 279 investors and effected compliance with DR 2–107. If an agent's acts are within the scope of his authority and are related to matters over which such authority extends, notice to the agent is then deemed to be notice to the principal. *Williams v. Jennings*, 755 S.W.2d 874, 883 (Tex.App.— Houston [14th Dist.] 1988, writ denied); *Kirby v. Cruce*, 688 S.W.2d 161, 168 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Accordingly, we hold that the agreement was valid and enforceable.

We sustain points of error one through eight.

### Language of the Agreement

In points of error nine, ten, and eleven, Polland maintains that the trial court erred in finding that the referral fee agreement was unambiguous, in finding that the referral agreement contained a condition precedent to the recovery of a one-third referral fee, and in holding that the language in the contract indicating that the parties would

mutually agree to a referral fee constituted only an obligation to enter into negotiation in the future.

▮ Whether a contract is ambiguous is a question of law; if the document is reasonably susceptible to more than one meaning, it is ambiguous. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Gulf & Basco Co. v. Buchanan,* 707 S.W.2d 655, 657 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

▮ The operative contract language in this case provides:

> [T]he ATTORNEY OF RECORD herein agrees to compensate the FORWARDING ATTORNEYS by paying a sum equal to one-third (⅓) of fees to be collected from all said clientele for the contemplated legal action. *All funds received will be placed in the trust account of Jeffrey A. Lehmann, Tr until [sic] $150,000 from this or other groups referred is placed in there in the name of Quorum Management Corp. Trustee & it will then be disbursed. Should the total not be reached the parties will meet and determine the referral fee by mutual agreement.*

The portion of the language underlined above is handwritten and was drafted and inserted by Lehmann. We hold that the contract is ambiguous because there are at least two reasonable, yet different meanings that could be inferred from this language. First, the contract could be read as Lehmann has contended; that is, that a one-third referral fee would be paid if $150,000 was collected and that if $150,000 was not collected, then no referral fee would be due unless the parties subsequently met and agreed that there would be a referral fee. Second, the agreement could be read as only requiring a one-third referral fee if $150,000 was collected, but still requiring some referral fee if less than $150,000 was collected, the subsequent amount of a reasonable referral fee to be determined at a later date. Where a question exists about the true meaning of a vital statement of fact contained in a document, the court should examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless. *Seaman v. Seaman,* 686 S.W.2d 206, 210 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

▮ Polland also contends that the handwritten language inserted by Lehmann did not create a condition precedent. The trial court's finding number 21 provides:

> Exhibit 1 [the referral fee agreement] has a condition precedent to the recovery of a one-third referral fee by Plaintiff from Defendants. That condition was not satisfied since only $110,597.63 was collected by the Defendants from the investor clients.

If a condition would impose an absurd, unreasonable, or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition. *Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.,* 679 S.W.2d 721, 724 (Tex.App.—Houston [1st Dist.] 1984, no writ). In the present case, a construction that the language created a condition precedent would result in no payment of a referral fee of any amount, a result that is inconsistent with the purpose of the agreement, as well as with Lehmann's own testimony that he fully intended to pay a referral fee at the time the contract was executed.

▮ Polland asserts that a proper application of the law leads to the inescapable conclusion that the operative language in the referral fee agreement evidenced an agreement that there would be a referral fee, with only the amount subject to any subsequent negotiation. The trial court's finding number 21 was that:

> [T]he agreement then provides another condition to the payment of any referral fee to plaintiffs. That is, the parties would mutually agree to a referral fee. Since the language creates an obligation to enter into negotiations in the future, the Court has no means to determine what sort of agreement between Plaintiff and Defendants the proposed negotiations would have produced, if any.

We hold that the agreement contemplated the payment of a referral fee. If parties have complied with an agreement, then the failure to supply the price in the contract does not leave the contract so incomplete that it cannot be enforced. *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex.1966).

We sustain points of error nine, ten, and eleven.

### Defense of Wrong Capacity

In points of error 12, 13, and 14, Polland asserts that the trial court's finding number 23 that there is no evidence that Lehmann, individually, is or should be liable for any of Polland's claims is not supported by the evidence and is against the greater weight and preponderance of the evidence and was proven to the contrary as a matter of law. The finding of the trial court was that Jeffrey A. Lehmann, individually, was sued in the wrong capacity. The burden to establish that he was sued in the wrong capacity was Lehmann's. TEX.R.CIV.P. 94. Our review of the record shows that the only evidence produced by Lehmann that he was sued in the wrong capacity was his testimony that he has never practiced law in any form other than as a personal corporation. Lehmann also testified that the name Lehmann & Associates was merely an assumed name for Lehmann & Associates, P.C.

Lehmann admitted, however, that he never identified himself as operating in a corporate capacity in any communications or dealings with Polland. Lehmann also admitted that no document bearing his name or signed by him reflected that he was doing business as a corporation or that he was personally executing the documents only as a representative of the corporation. Rather, every document admitted into evidence contains merely the business name "Lehmann & Associates" and "Jeffrey Lehmann." These documents included all of the contractual arrangements between Lehmann, the investors, and Quorum, as well as documents between Lehmann and Polland. Additionally, Lehmann's stationery failed to evidence that he was operating in a corporate capacity.

We hold that the evidence conclusively established that Jeffrey A. Lehmann is individually liable for amounts owed under the agreement and that the trial court's finding to the contrary is supported by factually insufficient evidence. We sustain points of error 12, 13, and 14.

The judgment of the trial court is reversed, and the cause is remanded to the trial court for determination of a reasonable referral fee that Jeffrey A. Lehmann and Jeffrey A. Lehmann & Associates, jointly and severally, must pay to Polland & Cook, in light of the agreement of the parties.

O'CONNOR, J., dissenting.

O'CONNOR, Justice, dissenting.

This case presents the issue of whether a lawyer who refers a case to another lawyer because of a conflict of interest may claim a referral fee. I would hold that he cannot and would affirm the judgment of the trial court.

### The disciplinary rules

Polland claims the trial court erred in holding that *Fleming v. Campbell*, 537 S.W.2d 118, 119 (Tex.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) and *Lemond v. Jamail*, 763 S.W.2d 910, 914 (Tex.App.—Houston [1st Dist.] 1988, writ denied), prevent his recovery.

Polland contends that Quorum, acting on behalf of the clients, agreed to the referral fee. Lehmann contends that Quorum was not the actual client and could not consent on their behalf to a referral fee. In this case and on these facts, I agree with Lehmann. Polland, although he admitted he could not represent the investors in the bankruptcy proceeding because he represented the debtor, drafted the documents for Quorum to send to the investors to get their authority for Quorum to hire an attorney and drafted a letter from Quorum to Lehmann in which Quorum agreed to pay Polland the referral fee. Polland extracted the execution of the referral fee from Lehmann at a meeting by dangling a check for $20,000 from the investors. In these trans-

actions, Polland was acting within an area of conflict of interest.

On page 736 of the majority opinion, the majority notes a number of distinctions between this case and *Fleming* and *Lemond*. In spite of those distinctions, both *Fleming* and *Lemond* stand for the proposition that disclosure has as its purpose the client's right to know the nature and basis of the legal representation. That principle is probably more important in this case than in either *Fleming* and *Lemond*. Here, the lawyer claiming a referral fee was involved in the same litigation; in *Fleming* and *Lemond*, the lawyer claiming the fee had no involvement in the litigation. Here, the lawyer claiming the fee was in the position to decide the merits of the other party's case; in *Fleming* and *Lemond*, no such conflict existed.

### Conflict of interest

Lehmann contends that Polland, as the lawyer for the bankruptcy debtor, could not collect a referral fee from Lehmann, the lawyer for the bankruptcy creditors. I agree.

I believe the old and the new disciplinary rules presuppose that the forwarding lawyer does not have a disability that would prevent the formation of an attorney-client relationship between the forwarding attorney and the client.[1] Here, Polland did not and could not have had an attorney-client relationship with the clients because, as he recognized, he had a conflict of interest. In fact, part of Polland's argument is that he was merely a forwarding lawyer and was never a lawyer employed by the clients. Lehmann, in response, argues that if Polland could not have represented the clients, he could not collect any part of the legal fees.

Polland, in his pleadings, claimed to have a partnership with Lehmann regarding the representation of the investors. Polland's petition claims:

> By entering into this Referral Agreement, all parties became *partners* whereby Lehmann & Assoc. provided legal services and Polland & Cook provided the clients.

(Emphasis added.) Polland and Lehmann could not legally be "partners" in the bankruptcy action: Polland represented the debtor, and Lehmann represented the creditors. Polland could not represent both.

During the trial, Polland was asked about the fee disclosure statement filed with the bankruptcy court:

> Q. When you assisted Major Funding Corporation in filing its petition for a Chapter 11, did you not sign a fee disclo-

---

1. The only case that I could find that dealt with this issue is *Musslewhite v. State Bar*, 786 S.W.2d 437 (Tex.App.—Houston [14th Dist.] 1990, writ denied), a case involving a suit on an agreed judgment executed to settle a disciplinary action. Under the terms of the agreed judgment, Musslewhite was suspended from the practice of law for 90 days and placed on a three-year probation. The agreed judgment permitted Musslewhite to refer potential clients to other lawyers, but he could not represent them. *Id.* at 439. The agreed judgment made no provision about accepting a referral fee for the cases referred during the 90-day suspension. Because Musslewhite violated the agreed judgment by representing clients while he was suspended, the State Bar filed a motion to revoke Musslewhite's probation. *Id.*

On appeal, *Musslewhite* raised the issue that, to refer the new clients, he first had to be employed by them. *Id.* at 443. He argued that the agreed judgment was in conflict with DR 2–107. In response, the court of appeals noted two things. First, the agreed judgment prohibited Musslewhite from accepting new employment as a lawyer, it was not intended to facilitate his recovery of referral fees. *Id.* Second, DR 2–107 does not mean that a lawyer must first be employed by a client before he can refer the case to another lawyer and collect a referral fee. *Id.*

As to the first statement, the Fourteenth Court of Appeals said that Musslewhite's ability to collect referral fees was not the intent of the agreed judgment. Thus, because the ability to claim a referral fee is the only issue here, *Musslewhite* does not help us resolve our case. As to the second statement, I respectfully disagree. I agree that DR 2–107 did not interfere with the terms of the agreed judgment—Musslewhite could refer cases during his 90–day suspension. Nothing in the agreed judgment, however, addressed whether Musslewhite could collect a referral fee for those cases. The court's statement—that a lawyer is not required to be employed by a client before he can refer the client to another lawyer and collect a referral fee—is dicta because the agreed judgment did not address the issue of referral fees.

sure statement with the bankruptcy court?

Q. Yeah, one was filed.

Q. And that was in 1986?

A. I believe that the bankruptcy was filed in 1986.

\* \* \* \* \* \*

Q. To your knowledge, however, in that compensation statement, do you have to make the affirmation that you have no conflict or interest adverse to that of the estate? Is that not true? I am just asking you.

A. I believe so.

\* \* \* \* \* \*

Q. Now, did you ever amend or supplement your compensation schedule ... to reflect the additional compensation that you were planning to receive from an interest that was potentially adverse to the estate?

The last question was objected to by counsel for Polland and was not answered.

A lawyer cannot represent opposing parties to the same litigation. TEX. DISCIPLINARY RULES OF PROF. CONDUCT, Rules 1.05, 1.06, 1.09 (1992); SUPREME COURT OF TEXAS, CODE OF PROFESSIONAL RESPONSIBILITY, Canons 4, 9 (1988). By representing the bankruptcy debtor, MFC, and by sharing in the fees of the bankruptcy creditors, the 279 investors, Polland would have collected legal fees from both sides of the same litigation. As stated in the comment that follows rule 1.06, loyalty is an essential element in the lawyer's relationship to a client. TEX. DISCIPLINARY RULES OF PROF. CONDUCT, Rule 1.06 comment 1 (1992). The comments also state:

> Loyalty to a client is impaired not only by the representation of opposing parties in situations within paragraphs (a) and (b)(1), but also in any situation when a lawyer may not be able to consider, recommend or carry out an appropriate course of action for one client because of the lawyer's own interests or responsibilities to others.

*Id.* at comment 4.

I would hold that Polland's loyalty to his own client, MFC, as well as to the investors, was tainted by his own interest in the referral fee from the investors. The investors, as the real clients, had a right to know about Polland's role in the bankruptcy.

Rule 1.06, "Conflict of Interest: General Rule," states in part:

> (a) A lawyer shall not represent opposing parties to the same litigation.

> (b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

>> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interest of another client of the lawyer or the lawyer's firm; or

>> (2) reasonably appears to be or become adversely limited by the lawyer's or the law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

> (c) A lawyer may represent a client in the circumstances described in (b) if:

>> (1) the lawyer reasonably believes the representation of each client will not be materially affected; and

>> (2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implication, and possible adverse consequences of the common representations and the advantages involved, if any.

I would also note that rule 1.09 required Polland to obtain consent from MFC to receive funds under the fee-split arrangement. Rule 1.09(a) provides: "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client...." There is no evidence in the record to indicate that Polland received MFC's consent regarding the arrangement with the investors.

"A party is forbidden to do indirectly that which he is forbidden to do directly." *Shenson v. Fresno Meat Packing Co.*, 96 Cal.App.2d 725, 216 P.2d 156, 160 (1950); *see also Reherman v. Oklahoma Water Resources Bd.*, 679 P.2d 1296, 1301

(Okla.1984); *Corkins v. Ritter,* 326 Mich. 563, 40 N.W.2d 726, 729 (1950); *League Gen. Ins. Co. v. Budget Rent–A–Car,* 172 Mich.App. 802, 432 N.W.2d 751, 753 (1988). Here, Polland, by his own admission could not represent the investors because he represented MFC. Instead, Polland attempted to do indirectly what he could not do directly—obtain a fee for representing investors, who had interests adverse to his existing client, MFC. To grant Polland relief under the fee-splitting agreement would enable Polland to benefit from conduct that is forbidden under the disciplinary rules and contrary to the public interest. *See Daley v. City of Melvindale,* 271 Mich. 431, 260 N.W. 898, 900 (1935) ("Equity ... will not permit that to be done by indirection which, because of public policy, cannot be done directly").

Individuals who are represented by attorneys should be represented without actual or apparent conflicts of interest on behalf of the attorney who is their chosen advocate. *See Davis v. Stansbury,* 824 S.W.2d 278, 283 (Tex.App.—Houston [1st Dist.], 1992) (orig. proceeding). The public should be protected from fee-splitting arrangements in situations where the forwarding or referring attorney could not undertake representation due to a prohibition set forth in law or policy. RESTATEMENT (SECOND) OF CONTRACTS § 179 (1979). The policy underlying the prohibition against conflicts of interest set forth in the disciplinary rules has a regulatory purpose and clearly outweighs the interest of Polland in enforcing the agreement. RESTATEMENT (SECOND) OF CONTRACTS § 181 (1979).

Polland argues that Lehmann should not be allowed to claim that the agreement is invalid, because Lehmann received substantial benefits under the contract. When a contract is against the law or public policy, the courts will not enforce it. *Baron v. Mullinax, Wells, Mauzy & Baab, Inc.,* 623 S.W.2d 457, 461 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.) (suit between law firm and former associate, who claimed he was not required to pay his former firm a referral fee on cases he took with him after he left.). As a general rule, parties to an illegal transaction are left where they find themselves. *O'Hara v. Ahlgren, Blumenfeld & Kempster,* 127 Ill.2d 333, 130 Ill. Dec. 401, 408, 537 N.E.2d 730, 737 (1989). The principle of public policy is stated as *"Ex dolo malo non oritur actio,"* which loosely translates: no court will lend its aid to a person who found his cause of action upon an immoral or an illegal act.