**Affirmed in Part, Reversed and Remanded in Part, and Opinion filed October 27, 2011.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-00707-CV

---

## EXPRO AMERICAS, LLC, Appellant

## V.

## SANGUINE GAS EXPLORATION, LLC, Appellee

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2008-64020A**

---

### O P I N I O N

Expro Americas, LLC ("Expro") sued Sanguine Gas Exploration, LLC ("Sanguine") for allegedly breaching its agreement to provide defense and indemnity to Expro. Both parties filed motions for summary judgment. The trial court granted Sanguine's motion and denied Expro's motion. We affirm the portion of the trial court's judgment in which the court denied Expro's motion, reverse the portion of the judgment in which the court granted Sanguine's motion, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Sanguine is an Oklahoma-based entity which operated an oil-and-gas lease in Wheeler County, Texas. Sanguine hired Anadarko Consultants, Inc. ("Anadarko") "to design, manage, and directly supervise" a drilling project on the lease. Anadarko had previously performed similar services for Sanguine. Tom Garner was the owner of Anadarko.

Roy Judd, an employee of Anadarko, worked as "company man" at the well site.[1] In this capacity, Judd frequently requested services and equipment from contractors and signed hundreds of job tickets pertaining to these services. Judd contacted Expro to request "choke flow services." Expro employee Brandon Schreck provided the requested services and then presented Judd with a job ticket to sign. The reverse side of the ticket was entitled "Rental and Service Agreement Terms and Conditions" and contained eight separate provisions. Provision seven was entitled "**RELEASE & INDEMNITY**." According to verbiage in this provision, the parties agreed to indemnify each other and procure insurance covering their respective indemnity obligations. Schreck did not explain any of the language or refer Judd to the reverse side of the ticket. Further, Judd signed the ticket without reading the provisions. Sanguine received a copy of the ticket and paid for the services rendered by Expro without objection.

Subsequently, Expro was named as a defendant in a lawsuit arising from a fatal accident that occurred at the well site. Expro demanded Sanguine provide defense and indemnity in connection with the underlying suit. After Sanguine rejected the demand, Expro filed a cross-claim against Sanguine. The trial court granted the parties' joint motion to sever Expro's cross-claim. The parties then filed opposing motions for

---

[1] In its motion for summary judgment, Expro cited the following definition of "company man": "The representative of the oil company or operator on a drilling location. For land operations, the company man is responsible for operational issues on the location, including the safety and efficiency of the project. Even administrative managers are expected to respond to the direction of the company man when they are on the rigsite." *See* Schlumberger Oilfield Glossary, www.glossary.oilfield.slb.com/Display.cfm?Term=company%20man, last accessed October 2011.

summary judgment. The trial court granted Sanguine's motion without specifying its reasoning and denied Expro's motion. Expro now appeals.

## II. STANDARD OF REVIEW

We review a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When a trial court does not specify the grounds for granting summary judgment, we must affirm if any summary-judgment ground is meritorious. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). In reviewing either a no-evidence or traditional summary-judgment motion, we must take as true all evidence favorable to the nonmovant and draw every reasonable inference and resolve all doubts in favor of the nonmovant. *Mendoza v. Fiesta Mart*, 276 S.W.3d 653, 655 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and he is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant establishes his right to summary judgment, the burden shifts to the nonmovant to raise a genuine issue of material fact. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

In a no-evidence motion for summary judgment, the movant must specifically identify the elements for which there is no evidence. *Walker v. Thomasson Lumber Co.*, 203 S.W.3d 470, 473–74 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The trial court must grant the motion unless the respondent presents evidence raising a genuine issue of material fact. Tex. R. Civ. P. 166a(i). However, the respondent is "'not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements.'" *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (quoting Tex. R. Civ. P. 166a(i) cmt. (1997)).

When both parties move for summary judgment and the trial court grants one motion and denies the other, we review summary-judgment evidence from both parties

and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We must render the judgment that the trial court should have rendered. *Id.* We may consider evidence presented by both parties in determining whether to grant either motion. *See Knighton v. Int'l Bus. Machs. Corp.*, 856 S.W.2d 206, 208–09 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *River Oaks Shopping Ctr. v. Pagan*, 712 S.W.2d 190, 193 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

### III. OBJECTIONS TO SUMMARY-JUDGMENT EVIDENCE

As an initial matter, we note that Sanguine contends certain portions of an affidavit filed by Expro are inadmissible because they incorporate expert opinions but Expro neither designated the affiant as an expert nor established his qualifications. Failure to designate a testifying expert and an expert's alleged lack of qualifications are defects of form on which an appellant must object and obtain a ruling to preserve error. *Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 102, 105 (Tex. App.—Dallas 2010, pet. denied). Sanguine concedes the trial court did not rule on these objections. Consequently, they are waived.[2]

### IV. BREACH OF CONTRACT

We next consider whether the trial court erred by granting Sanguine's no-evidence motion for summary judgment. In its no-evidence motion, Sanguine argued Expro cannot present any evidence supporting the elements of its breach-of-contract claim or enforceability of the indemnity provision.

To recover for breach of contract, a plaintiff must show (1) existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result of the defendant's breach. *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston

---

[2] Apparently, Sanguine also objects that certain portions of Judd's deposition testimony amount to inadmissible legal conclusions. We do not address this objection because those portions of Judd's testimony are inconsequential to our disposition.

4

[14th Dist.] 2010, pet. denied).  The elements of a valid contract are (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) meeting of the minds, (4) a communication that each party consented to the terms of the contract, (5) execution and delivery of the contract with intent it become mutual and binding on both parties, and (6) consideration.  *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

Uncontroverted evidence establishes the following facts: (1) Expro performed services at the well-site; (2) Judd signed the job ticket presented by Expro; (3) the reverse side of the job ticket contained an indemnity provision; (4) Expro demanded indemnity from Sanguine; and (5) Sanguine denied Expro's demand.  Courts presume a party that signs a contract knows its contents, and absent fraud or imposition, a party's failure to read an instrument before signing is not a ground for avoiding it.  *In re Bank of Am., N.A.*, 278 S.W.3d 342, 344–45 (Tex. 2009).  Therefore, these facts satisfy the above mentioned elements for breach of contract *if* Judd had authority to sign the indemnity provision on behalf of Sanguine and the provision satisfied the conspicuousness requirement of the fair-notice doctrine.  The parties argued these issues in their traditional motions for summary judgment, and we will address them in turn.

## V.  ACTUAL AND APPARENT AUTHORITY

Expro contends the trial court should have granted summary judgment in its favor because the evidence conclusively established that Judd had actual or apparent authority to subscribe Sanguine to the indemnity agreement.

### A.  Actual Authority

#### 1.  Relevant Law

A principal is liable for the acts of its agent only when the agent has actual or apparent authority to perform those acts or when the principal ratifies the agent's conduct.[3]  *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d

---

[3] At the trial court, Expro filed supplemental briefing regarding ratification.  However, on appeal,

764, 783 (Tex. App.—Houston [1 Dist.] 2011, no pet. h.).  We will first address whether the summary-judgment evidence presents a fact issue regarding Judd's actual authority to bind Sanguine to the indemnification provision.

Actual authority refers to responsibility a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses.  *2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  In determining whether an agent had actual authority to act for his principal, we examine the principal's words and conduct relative to the agent.  *See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550 (Tex. App.—Houston [14th Dist.] 2003, no pet.).  A finding of actual authority cannot be based merely on the words or deeds of the agent.  *Id.*

Actual authority may be expressed and implied.  *2616 S. Loop L.L.C.*, 201 S.W.3d at 356.  Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal.  *Reliant Energy Servs.*, 336 S.W.3d at 783.  Implied authority is the authority of an agent to do whatever is necessary and proper to carry out the agent's express powers.  *Id.*  Implied agency therefore exists only as an adjunct to express actual authority; an agent who does not have express authority cannot have implied authority.  *Id.*

## 2.  Analysis

We begin our analysis by summarizing the summary-judgment evidence.  In his deposition, Judd provided the following testimony.  He was employed by Anadarko as the company man overseeing drilling of the well.  It was standard operating procedure for Judd as a company man to sign job tickets thereby "acknowledging that the work had been completed so [the service provider] could get paid," and he did not understand what

---

Expro did not argue ratification until it filed a reply brief.  Consequently, we will not consider the ratification. *See* Tex. R. App. P. 38.3; *Marsh v. Livingston*, No. 14-09-00011-CV, 2010 WL 1609215, at *4 (Tex. App.—Houston [14th Dist.] Apr. 22, 2010, pet. denied) (mem. op.).

other legal effects his signature had. He signed over one-thousand tickets during the project. No one from "Anadarko or Sanguine ever communicated to [Judd] either in writing or orally that [he had] authority to bind Sanguine to certain release, indemnity or hold harmless language like provisions that are already found in the Expro field tickets," and Judd never told anyone he had such authority. Judd was the person who requested Expro's services. When Judd signed Expro's job ticket, he knew there was writing on the reverse side, but he did not read it. He was unaware of the indemnity provision before the accident made the basis of the underlying claim.

Sanguine is listed as "CUSTOMER" on the Expro job ticket, and Judd signed the ticket as "CUSTOMER REP." Furthermore, the following language appears directly above the signature line:

> EQUIPMENT LISTED HEREIN RECEIVED; I HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON THE REVERSE SIDE AND REPRESENT THAT I AM AUTHORIZED TO SIGN THIS AGREEMENT AS A CUSTOMER'S AGENT.

Expro employee Schreck provided the following relevant testimony during his deposition. Judd requested Expro to provide choke flow services at the well site. Schreck performed the services and presented Judd with the job ticket. Schreck believed he was doing business with Sanguine when he communicated with Judd. However, Schreck did not communicate with Judd regarding the language on the reverse side of the ticket. Expro instructed Schreck to obtain a signature on the tickets so Expro could "start rent" and "show proof of delivery of service." Schreck was also instructed that only a company man may sign a job ticket, not "another foreman or supervisor or driller or tool pusher."

The following excerpts from the deposition of Sanguine corporate representative Tom Fuller are relevant. Anadarko was hired to provide "the technical expertise to drill a well." Anadarko's duties included requesting services and products from other contractors and determining whether choke flow services were necessary. Fuller has been aware since the 1990s that company men sign documents at the well site. The

7

purpose of company men signing job tickets is to confirm that equipment and services have been provided. When Judd signed the Expro ticket, Sanguine was aware that the back side of many job tickets contained terms; however, "none of that had ever really been brought to our attention or had been the subject of any issue" before this lawsuit. Sanguine did not give Anadarko authority to bind Sanguine on the job tickets. Further, Sanguine did not provide any restrictions or instructions to Anadarko regarding Judd's duties as a company man. Sanguine instructed Anadarko owner Garner to verify the accuracy of the job tickets before forwarding the tickets to Sanguine. Service providers understood that they would receive payment from Sanguine, not Anadarko. Sanguine ultimately received the Expro job ticket and paid for the services rendered without objection.

We hold that the foregoing evidence does not conclusively establish that Sanguine expressly authorized Anadarko or Judd to sign indemnification agreements on its behalf. *See Reliant Energy Servs.*, 336 S.W.3d at 783. Thus, we overrule Expro's contention that it was entitled to summary judgment on its claim for indemnity because Judd had express actual authority to bind Sanguine on Expro's indemnity provision.

Nevertheless, arguing that "[w]ithout the authority to enter into contracts with service providers, Judd could not have obtained necessary services to perform his duties," Expro contends the evidence conclusively establishes that Judd had implied actual authority to bind Sanguine. Further, Expro argues that a principal could choose to disregard any terms it found inconvenient, even though the goods or services were already provided, if a company man lacked authority to bind his principal to the terms of a job ticket.

To support its position, Expro cites *Polland & Cook v. Lehmann*, 832 S.W.2d 729 (Tex. App.—Houston [1st Dist.] 1992, writ denied). In *Polland*, Quorum was delegated authority to retain, employ, and agree to compensate legal counsel on behalf of certain investors. *Id.* at 731, 737–38. Quorum contacted a law firm which referred Quorum to another attorney. *Id.* at 731. Quorum hired the attorney and consented to payment of a

8

referral fee to the law firm. *Id.* at 731–32. The attorney later argued that Quorum was not the actual client (the investors were) and lacked authority to consent to the referral fee. *Id.* at 737–38. The court of appeals disagreed, holding that Quorum had authority to execute "whatever attorney-client arrangement was made on behalf of the investors," including the referral-fee agreement. *Id.* at 738.

Expro also cites *Augusta Development Co. v. Fish Oil Well Servicing Co., Inc.*, 761 S.W.2d 538 (Tex. App.—Corpus Christ 1988, no writ). Augusta was a well-site operator which hired independent consultant Dirks to supervise re-entry of a well on project number one. *Id.* at 541. Dirks was delegated authority to negotiate prices with service providers and hired Fish Oil to provide certain equipment. *Id.* at 541, 544. Dirks's president testified that it was customary practice for Dirks to assume the position of operator at the job site. *Id.* at 544. Less than one month after project one was completed, Augusta hired Fish Oil to provide equipment for project number two. *Id.* at 541. Subsequently, Augusta hired Dirks as the consultant for project two. *Id.* Dirks employee Randolph was the on-site supervisor for project two. *Id.* Randolph testified that Augusta's president explicitly gave him authority to hire Fish Oil or another contractor to supply certain equipment. *Id.* at 544. Randolph signed Fish Oil's job tickets, which contained language providing that Augusta would pay 18% interest on the amounts owed to Fish Oil. *Id.* at 541. Fish Oil later sued Augusta when it refused to pay the full amount billed. *Id.* Augusta claimed that Randolph did not have authority to bind Augusta to the interest rate. *Id.* The trial court disagreed, and the court of appeals affirmed. *Id.* at 540–41. The court of appeals declared, "Generally, a supervisor on the site of a construction project or an oil well is considered the agent of the owner or developer and has the implied authority to bind him in contracts necessary for the completion of the project." *Id.* at 544. The court recognized that (1) Randolph was instructed by Augusta to hire Fish Oil or another contractor, (2) Dirks had authority during project number one to negotiate prices with Fish Oil, and (3) Augusta had already orally agreed to hire Fish Oil on project number two. *Id.* The court concluded,

9

"Randolph, as supervisor on the well site, had the implied authority to contract on behalf of Augusta for normal rates of interest in order to secure Fish Oil's materials and services at the well site." *Id.*

We conclude that *Polland* and *Augusta Development Co.* are distinguishable from the present case. Both cases involved an agent who was assigned the task of hiring contractors and negotiating payment of their services. The courts determined that agreeing to a referral fee or an interest rate was subsumed within such duties. However, under the summary-judgment evidence, we conclude that subjecting Sanguine to massive financial risk of indemnifying Expro for its own negligence would not be an ordinary aspect of Anadarko's duty of retaining services and equipment for the project. *See Rourke v. Garza*, 530 S.W.2d 794, 804 (Tex. 1975)[4] ("Contracts indemnifying one against his distribution of defective products should be viewed as exceptions to the usual business practice . . . . [Such contracts] may have great financial impact on the parties, and are therefore not of the kind ordinarily executed by a superintendent of job sites."), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007).[5] The Corpus Christi Court of Appeals's statement that "[g]enerally, a supervisor on the site of a construction project or an oil well is considered the agent of the owner or developer and has the implied authority to bind him in contracts necessary for the completion of the project" should not be read so broadly as to infer that a supervisor has *carte blanche* authority to sign any contract. *Augusta Dev. Co.*, 761 S.W.2d at 544.

We recognize that Judd frequently determined which services were necessary for the project, requested those services, and signed the service providers' job tickets, some of which included indemnity provisions. As discussed below, Judd's duties differed from the signatory in *Rourke*, who did not order the services. 530 S.W.2d at 803. However, it

---

[4] Although *Rourke* pertains to apparent authority and is addressed at length in the subsequent section, it is instructive in addressing implied actual authority.

[5] Expro also argues that disfavor for indemnity agreements is neutralized by the fair-notice requirements of such agreements. However, the fair-notice doctrine does not affect the requirement that enforceable agreements must be signed by someone with authority.

is uncontroverted that Judd was not actually aware of the indemnity provision at the time he signed the Expro job ticket. In fact, both Sanguine and Judd believed the purpose of the tickets was simply to memorialize delivery of goods and services. Further, Sanguine had instructed Anadarko owner Garner to review tickets before forwarding them to Sanguine. Thus, Judd did not believe, and Sanguine did not intentionally or negligently allow Judd to believe, he possessed such authority. *See 2616 S. Loop L.L.C.*, 201 S.W.3d at 356 ("[A]ctual authority . . . usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses.").

Expro also argues Judd held himself out as having the requisite authority because the ticket contained language indicating that the signatory read all terms and conditions of the agreement and has authority to sign. *See also In re Bank of Am.*, 278 S.W.3d at 344–45 (recognizing that, absent fraud, person who signs agreement is presumed to have consented to its terms and may not excuse himself for failing to read agreement). However, an agent's words and conduct, standing alone, are not sufficient to establish actual authority. *Walker Ins. Servs.*, 108 S.W.3d at 550. Because no other evidence supports a finding that Judd had actual authority to bind Sanguine, his signature on the ticket does not support such a finding.

Although Judd had authority as the company man to determine and request necessary services and to sign job tickets, no evidence supports an inference that execution of indemnity agreements was a necessary and proper facet of his responsibilities. *See Reliant Energy Servs.*, 336 S.W.3d at 783. *But see generally Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777 (5th Cir. 2004) (applying Louisiana law and holding company man had implied actual authority to bind operator to indemnity provision on job ticket). We agree with Expro there is no statutory or common law supporting the proposition that indemnity provisions are not binding unless signed by corporate executives. However, considering the summary-judgment

11

evidence, Expro did not conclusively establish that Judd had actual implied authority to make major risk-allocation decisions for Sanguine.

## B. Apparent Authority

We next determine whether a fact issue exists regarding Judd's apparent authority to bind Sanguine to the indemnity provision.

### 1. Relevant Law

Apparent authority is the power of an agent to affect the legal relations of the principal by transactions with a third party. *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984). An agent acting within the scope of his apparent authority binds the principal as if the principal itself had taken the action. *Id.* Apparent authority is based on estoppel, and only the conduct of the principal in leading a third party to believe that the agent has authority may be considered. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007); *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996). Declarations of authority by the alleged agent, without more, do not establish either the existence or the scope of the alleged authority. *Gaines*, 235 S.W.3d at 183–84. Rather, the reviewing court looks to "acts of participation, knowledge, or acquiescence by the principal." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex. 1998). Without the principal's participation—either through its acts, or knowledge of and acquiescence in acts of the agent—no mere combination of circumstances, including acts of the purported agent which may mislead persons into a false inference of authority, however reasonable, will serve as the predicate for apparent authority. *Reliant Energy Servs.*, 336 S.W.3d at 784.

Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise. *Gaines*, 235 S.W.3d at 182. The applicable standard is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority. *Id.* at 182–83. A party seeking

12

to recover under an apparent-authority theory must show justifiable reliance on the principal's words or conduct resulting in harm to the party. *Reliant Energy Servs.*, 336 S.W.3d at 784. Further, the party must show that the principal had full knowledge of all material facts at the time of the conduct alleged to be the basis for the apparent authority. *Gaines*, 235 S.W.3d at 182; *Rourke*, 530 S.W.2d at 803.

### 2. Analysis

Both parties refer to *Rourke*, in which the Texas Supreme Court addressed whether an agent had apparent authority to sign an indemnity agreement on behalf of his principal. 530 S.W.2d 794. In *Rourke*, Har-Con was a construction firm working at several job-sites in Galveston. *Id.* at 797. Har-Con employee Newton was a superintendent in charge of Har-Con activities at several sites. *Id.* Rourke was a contractor that rented equipment to be used at construction sites and had previously rented equipment to Har-Con. *Id.* Personnel at Har-Con's Houston office requested that Rourke provide equipment to one of the Galveston sites. *Id.* at 797, 803. Rourke's employee delivered the equipment and then asked Newton to check it and sign a job ticket. *Id.* at 797. The ticket included language verifying that the equipment had been received; however, an indemnity provision was on the reverse side of the ticket. *Id.* Subsequently, a Har-Con employee sued Rourke after he was injured while using the equipment. *Id.* at 797–98. Rourke impleaded Har-Con based on the indemnification provision. *Id.* at 797. A jury found that the Har-Con employee was injured by Rourke's defective product. *Id.* at 798. The jury also found that Newton had apparent but not actual authority to subscribe Har-Con to the indemnification agreement. *Id.* at 802. However, the trial court granted Har-Con's motion to disregard the jury's answer on apparent authority. *Id.* The court of appeals affirmed. *Id.* at 797.

The Texas Supreme Court analyzed whether Har-Con's prior dealings with Rourke or the fact that Har-Con placed Newton in the position of superintendent gave rise to Newton's apparent authority to sign the indemnification agreement on Har-Con's behalf. *Id.* at 802. First, Rourke argued Newton had apparent authority because in prior

13

dealings, Har-Con had paid several bills based on job tickets signed by various Har-Con employees and these tickets included indemnity provisions. *Id.* at 803. The court held Har-Con's payment of prior tickets did not give rise to apparent authority because (1) Har-Con was not aware of the provisions until after Newton signed the ticket at issue, (2) no facts supported a finding that Har-Con should have been aware of the provision, such as discussions with Rourke pertaining to indemnity, (3) someone at Har-Con's Houston office, not Newton, requested Rourke's services, and (4) neither Newton nor the Rourke delivery man was aware of the indemnification provision—they both believed the ticket merely memorialized delivery and rendered Har-Con liable for the delivered equipment. *Id.*

Second, Rourke argued that Newton's position as general superintendent of the Galveston-area sites supported the jury's apparent-authority finding. *Id.* The court, recognizing that "apparent authority [based on an agent's position] exists only as to those things ordinarily entrusted to one occupying such a position," held "the signing of such broad indemnity contracts is not a duty ordinarily entrusted to a person of Newton's position" because "[such agreements] may have great financial impact on the parties, and are therefore not of the kind ordinarily executed by a superintendent of job sites." *Id.* at 804. Although Newton was supervising and directing the work at four or five job sites, "[h]e was not in charge of acquiring supplies, other than small items, but would order them through Har-Con's office in Houston." *Id.* As additional support for its position, the court explained that apparent authority may be established only "by facts known to the party dealing with the agent and [relied] upon by him in such dealings." *Id.* No evidence supported an inference that Rourke relied on Newton's position as superintendent when the ticket was signed. *Id.* In fact, the evidence indicated that Rourke delivery men were permitted to have the tickets signed by any Har-Con employee, not just a superintendent. *Id.*

Expro argues the present case is factually distinguishable from *Rourke*. It is uncontroverted that Judd was the company man who ordered Expro's services and signed

the job ticket. Judd testified any observer would have believed he was representing Sanguine, and Fuller testified service providers such as Expro understood that Sanguine would pay their fees. Fuller testified it is industry standard for company men to sign terms and that he has known this fact since the 1990s. He stated that Sanguine knew there were terms on the back of tickets. However, he also testified that Sanguine did not instruct Judd or Anadarko relative to Judd's authority to sign tickets. Expro division manager Messer testified it is industry standard that company men request services and products and sign job tickets, and company men generally sign job tickets without question. Messer testified that tickets often contain terms and conditions on their reverse side which "can include" indemnity provisions, and an experienced operator should be aware of this.

Considering the evidence in the light most favorable to Expro, we conclude the evidence raises a fact issue regarding whether Expro could have reasonably believed Judd had authority to bind Sanguine to the indemnity provision. *See Gaines*, 235 S.W.3d at 182. Sanguine was aware that company men are generally responsible for signing job tickets and tickets may contain terms on their reverse side. Nevertheless, Sanguine did not limit Judd's authority. Consistent with customary conduct for a company man, Judd contacted Expro and requested services, and then met the Expro representative at the job site and signed the ticket. Thus, unlike the signatory in *Rourke*, who did not request the products and was merely one of several different persons who signed job tickets, Judd was the principal contact person between Sanguine and Expro and signed the ticket at the well site. In fact, according to Messer, Expro required that a company man sign its job tickets "based upon Expro's understanding that the company man is the highest ranking representative of the operator."

In sum, Expro did not conclusively establish that Judd had authority to sign the indemnification provision on behalf of Sanguine, and Sanguine did not conclusively establish the opposite. Accordingly, we hold that the summary-judgment evidence

15

presents a fact issue relative to Judd's authority to bind Sanguine to the indemnity provision on the reverse side of the job ticket.

## VI.  FAIR-NOTICE REQUIREMENTS

We next address Expro's contention that the trial court erred by granting summary judgment against Expro because the indemnity clause did not comply with the conspicuousness element of the fair-notice requirements.[6]

Because indemnification of a party from its own negligence involves an extraordinary shifting of risk, the Texas Supreme Court has enacted fair-notice requirements, including the conspicuousness requirement. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993); *Ayres Welding Co., Inc. v. Conoco, Inc.*, 243 S.W.3d 177, 181 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Whether an indemnity provision complies with the fair-notice requirements is a question of law, and an indemnity provision that fails to satisfy the requirements is unenforceable as a matter of law. *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004); *Dresser Indus.*, 853 S.W.2d at 509.

Under the conspicuousness requirement, something must appear on the face of the document to attract the attention of a reasonable person. *Dresser Indus.*, 853 S.W.2d at 508.  For example, an indemnity provision may be conspicuous if it contains language in capital headings or contrasting type and color or appears in a short document. *Id.* at 511.

Sanguine argues that (1) language on the front of the job ticket does not sufficiently refer readers to the provisions on the reverse side, (2) the provisions on the reverse side were written in "incredibly small" font and Judd testified that the provisions are "unreadable," and (3) the tickets were printed on colored, "onion skin-type paper" that further affected the readability of the provisions.

---

[6] Expro also argues that the indemnity provision complied with the express-negligence doctrine, a separate element of the fair-notice requirements.  We will not address this issue because Sanguine did not argue that the provision violated the express-negligence doctrine.

As noted above, the front of the job ticket contained the following capitalized language:

> EQUIPMENT LISTED HEREIN RECEIVED; I HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON THE REVERSE SIDE AND REPRESENT THAT I AM AUTHORIZED TO SIGN THIS AGREEMENT AS A CUSTOMER'S AGENT.

This court has recognized that indemnity provisions included among unrelated terms and conditions on the reverse side of a document generally do not satisfy the conspicuousness requirement when the provision is not set apart by contrasting font or typeface. *See U.S. Rentals, Inc. v. Mundy Serv. Corp.*, 901 S.W.2d 789, 792–93 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (citing *Safway Scaffold Co. of Hous., Inc. v. Safway Steel Prods., Inc.*, 570 S.W.2d 225, 228 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.); *K & S Oil Well Serv., Inc. v. Cabot Corp., Inc.*, 491 S.W.2d 733, 738 (Tex. Civ. App.—Corpus Christi 1973, writ ref'd n.r.e.)); *see also Dresser Indus.*, 853 S.W.2d at 511 (Tex. 1993) (determining indemnity provisions were not conspicuous because they were located on back of document among a series of numbered paragraphs without headings or contrasting type and not specifically identified as indemnity provisions on front of document); *Am. Home Shield Corp. v. Lahorgue*, 201 S.W.3d 181, 185 (Tex. App.—Dallas 2006, pet. denied) (determining indemnity provision was not conspicuous because it appeared "on the back of the contract in a series of numbered, uniformly printed and spaced paragraphs without headings or contrasting type").

Here, however, the one-page ticket specifically refers to terms on the reverse side, and the heading, typeface, and font of the indemnity provision are sufficient to attract a reasonable person's attention. *See Tynes v. Nations Rent of Tex. L.P.*, No. 10-05-00372-CV, 2006 WL 2438683, at *2 (Tex. App.—Waco Aug. 23, 2006, no pet.) (mem. op.) (holding indemnity provision on reverse side of ticket was conspicuous because provision was entitled in bold font, "Liability for Damage to Persons and Property," and front of ticket contained statement in bold font, "I have read and agree to all of the terms and

17

conditions on the front and reverse side of this contract.").[7] Only eight provisions appear on the reserve side of the ticket. Directly above the first provision, is the following bolded, italicized, and underlined language: "***BOTH PARTIES ACKNOWLEDGE THAT THE TERMS AND CONDITIONS, BELOW, ARE CONSPICUOUS AND AFFORD FAIR AND ADEQUATE NOTICE***." Provision seven is entitled "**RELEASE & INDEMNITY**," pertains solely to indemnification, and contains a lengthy bolded, italicized, and underlined definition for the phrase "Regardless of Cause." Additionally, notwithstanding use of small font and thin, colored paper, the provision is not unreadable. In fact, the capitalized and bolded heading "**RELEASE & INDEMNITY**" is prominent because of the small font. Construing the job ticket as a whole, we conclude as a matter of law that the indemnity provision would attract the attention of a reasonable person. *Dresser Indus.*, 853 S.W.2d at 508–09. Accordingly, we hold that the trial court erred to the extent it granted Sanguine's motion for summary judgment because the indemnity provision violates the conspicuousness requirement.

## VIII. TEXAS OILFIELD ANTI-INDEMNITY ACT

Finally, although it is unclear from the summary-judgment pleadings whether Sanguine actually sought judgment based on Expro's alleged failure to comply with the

---

[7] *But see Dana Corp. v. Microtherm, Inc.*, No. 13-05-00281-CV, 2010 WL 196939, at \*7 (Tex. App.—Corpus Christi Jan. 21, 2010, pet. granted, judgm't vacated w.r.m.) (concluding liability-limiting provision inconspicuous because statement on front of document, "REFER TO REVERSE SIDE FOR TERMS AND CONDITIONS OF SALE," does not suggest that liability-limiting provision was on reverse side); *Rourke v. Garza*, 511 S.W.2d 331, 344 (Tex. Civ. App.—Houston [1st Dist.] 1974) (concluding phrase on front side of document, "Received the above in good order subject to terms and conditions on reverse side," insufficient to direct reasonable person to indemnity provision on reverse side), *aff'd,* 530 S.W.2d 794 (Tex. 1975) (Texas Supreme Court did not address conspicuousness issue). We also acknowledge those cases in which courts held an indemnity provision was conspicuous because language on the front of the document specified that the reverse side contained an indemnity provision. *See Goodyear Tire & Rubber Co. v. Jefferson Const. Co.*, 565 S.W.2d 916, 917–18, 920 (Tex. 1978), *overruled on other grounds by Dresser Indus.*, 853 S.W.2d 505; *Akin v. Bally Total Fitness Corp.*, No. 10-05-00280-CV, 2007 WL 475406, at \*2 (Tex. App.—Waco Feb. 14, 2007, pet. denied) (mem. op.) (involving release provision); *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 190 (Tex. App.—Eastland 2000, pet. denied). Because the Expro job ticket is a single page and contains a well-contrasted indemnity provision on the reverse side, it was unnecessary for Expro to include a specific reference to indemnity on the front of the ticket.

18

mutual insurance requirement of the Texas Oilfield Anti-Indemnity Act ("TOAIA"),[8] because both parties briefed the issue, we will address it.

Indemnity provisions between oil-well drilling companies are void unless specific requirements are met to make the obligations mutual through the purchase of insurance. *See Cudd Pressure Control, Inc. v. Sonat Exploration Co.*, 202 S.W.3d 901, 904 (Tex. App.—Texarkana 2006, no pet.) (citing Tex. Civ. Prac. & Rem. Code Ann. §§ 127.003, 127.005). Specifically, an indemnity provision falls outside TOAIA when "the parties agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor." Tex. Civ. Prac. & Rem. Code Ann. § 127.005(a).

It is undisputed that the indemnity provision in the Expro ticket contains a subsection whereby the parties agreed to support their indemnity obligations by obtaining insurance coverage. Nevertheless, Sanguine argues that the mutual insurance requirement was not satisfied because Sanguine did not agree to procure the insurance coverage. However, the merit of this argument hinges on whether Sanguine was bound by the indemnity provision—an issue that was not conclusively established by either party in its motion for summary judgment.

## IX. CONCLUSION

In sum, we sustain in part and overrule in part Expro's sole appellate issue. We affirm the portion of the judgment in which the trial court denied Expro's motion, reverse the portion of the judgment in which the court granted Sanguine's motion, and remand for further proceedings consistent with this opinion.

/s/     Charles W. Seymore
Justice

Panel consists of Justices Anderson, Seymore, and McCally.

---

[8] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 127.001–127.007 (West 2011).

19