Laura Carter Higley, Justice
National Church Residences of Alief, TX ("NCR") and the Harris County Appraisal District ("HCAD") each moved for rehearing of our August 9, 2016 opinion. We granted rehearing and withdrew our August 9, 2016 opinion and judgment. We now issue this opinion and a new judgment in their stead.
NCR owns an apartment complex providing federally-subsidized housing to low-income elderly persons. For tax years 2012 and 2013, NCR requested that it be exempt, as a charitable organization under Texas Tax Code section 11.18(d)(13), from paying ad valorem taxes. See TEX. TAX CODE ANN. § 11.18(d)(13) (West 2015). NCR asserted that it was entitled to the exemption because it provided permanent housing and related support services to the elderly residents of its property without regard to the residents' ability to pay for the housing.
HCAD denied the requested exemption on the basis that NCR was not providing housing without regard to the residents' ability to pay. NCR filed suit, seeking judicial review of the denial. After the parties filed cross-motions for summary judgment, the trial court granted HCAD's motion and denied that of NCR. On appeal, NCR raises one issue, asserting that the trial court erred in ruling on the motions for summary judgment. NCR maintains that it was entitled to a property tax exemption under Tax Code section 11.18(d)(13) for tax years 2012 and 2013. Because we agree that NCR met its summary-judgment burden to show that it was entitled to a property-tax exemption for 2012 and 2013, we reverse and render judgment, granting NCR's motion.
Background
NCR is an Ohio nonprofit corporation, organized exclusively for charitable and educational purposes; it is exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code. NCR's articles of incorporation provide that it "shall have the power to provide elderly persons and handicapped persons with housing facilities and services specially designed to meet their physical, social, and psychological needs, and to promote their health, security, happiness, and usefulness in longer living" on a nonprofit basis.
Since 1995, NCR has owned a 62-unit apartment complex in Houston, known as the Evening Star Villa ("the Property"). That same year, NCR obtained financing from the Department of Housing and Urban *464 Development ("HUD") to develop the Property into low-income rental housing for the elderly. In conjunction with the financing, NCR entered into a Project Rental Assistance Contract with HUD. The contract indicated that NCR agreed to provide housing for low-income elderly persons at the Property, and HUD agreed to provide monthly subsidies to NCR "[to] cover the difference between [NCR's] Operating Expenses and tenant payments as determined in accordance with the HUD-established schedules and criteria." In other words, pursuant to the agreement, a tenant would pay a portion of the monthly rent, calculated under HUD's formulas depending on the tenant's income, and HUD would pay the remaining portion of the rent to NCR as a subsidy.
In return for receiving HUD's financial assistance, NCR was obliged to comply with various federal statutory and regulatory requirements regarding the management of the Property. HUD regulations also governed the application process for renting an apartment, establishing who was eligible to be a tenant at the Property. NCR summarized many of the eligibility requirements in its published "Tenant Selection Plan."
As stated in the Tenant Selection Plan, to be eligible for tenancy, a person must be at least 62 years old with an annual income that does not exceed certain income limits. Specifically, to be eligible for housing, a tenant must be in either the "very low" or "extremely low" income range as defined by HUD. To be in the "very low" income category, yearly income must not exceed $23,200 for one person or $26,500 for two people. To be in the "extremely low" income category, yearly income must not exceed $13,900 for one person or $15,900 for two people. There is no minimum income requirement to qualify.
A prospective tenant must "[a]gree to pay the rent required by the program...." A tenant is further required to pay at move-in "the full security deposit," equal to the tenant's portion of the monthly rent or $50, whichever is greater. A tenant must pay the security deposit from his "own resources and any other public or private resources."
NCR also had a published eviction policy, providing that, if a tenant fails to pay his non-subsidized portion of the rent by the third day of the month, the tenant will receive a 10-day notice. If the rent balance is still owed after the thirteenth day of the month, a three-day notice to vacate "will be issued to evict."
In addition to housing, residents of the Property have health, social, and educational services available to them. Some, but not all, of the services are provided through a federally-funded service coordination program and are staffed by a federally-funded service coordinator.
Beginning in 1997, NCR received an exemption from paying ad valorem taxes on the Property. NCR received tax exemptions from HCAD for the next 15 years. Then, on October 29, 2012, HCAD sent a letter to NCR, requesting it "to file a new application to confirm current qualification for the exemption." NCR filed an "Application for Charitable Organization Property Tax Exemption." With regard to its function, NCR checked the box on the form that stated, "Provides permanent housing and related social, health care and educational facilities for persons 62 years of age or older without regard to ability to pay." When asked to describe the use of the Property, NCR responded, "This property is used to provide housing for low income elderly without regard to ability to pay."
HCAD denied NCR's property-tax-exemption request for tax years 2012 and *465 2013. HCAD took the position that NCR was not providing its residents with housing or other services without regard to the residents' ability to pay. For that reason, HCAD asserted that NCR was not entitled to a property tax exemption under Tax Code section 11.18(d), as implied by NCR's s application.
NCR filed suit in district court, seeking judicial review of HCAD's denial of its request for a property-tax exemption. NCR claimed that it was entitled to an exemption under the Texas Tax Code. HCAD filed a motion for summary judgment regarding NCR's claim, asserting that NCR did not provide housing to its elderly residents without regard to their ability to pay, as required to receive the tax exemption.
In support of its motion, HCAD offered NCR's Tenant Selection Plan, which indicated that tenants must pay a security deposit at move-in, and tenants must agree to pay the rent required by the program under which they are receiving assistance. HCAD also pointed to NCR's eviction policy, which provided the procedure by which a tenant would be evicted for non-payment of rent.
In addition to filing a response to HCAD's motion, NCR filed a cross-motion for summary judgment. NCR claimed that it was entitled to a property-tax exemption under section 11.18(d)(13) for tax years 2012 and 2013 because it "provid[ed] permanent housing and related social, health care, and educational facilities for persons who are 62 years of age or older without regard to the residents' ability to pay."[1] Id. § 11.18(d)(13).
Included in NCR's summary-judgment evidence were the affidavits of its president and vice president, certain of its business and financial records, and documents detailing HUD regulations and requirements relevant to the Property's management and occupancy, such as the HUD Policy Handbook. NCR acknowledged that prospective tenants must agree to pay the rent required by the program providing assistance, and tenants must pay a security deposit before moving into to NCR's property. NCR asserted, however, that these requirements did not show that it provided housing and services to its elderly residents based on the residents' ability to pay.
NCR asserted that it treated all rental applicants the same, regardless of their ability to pay. NCR offered evidence showing that, although the market value of each apartment is $389, no resident pays the full $389 out of his or her own funds. Instead, the amount that each resident pays is determined by a HUD formula. Pursuant to the formula, the amount of rent each tenant must pay is the highest of (1) 30% of the person's adjustment monthly income; (2) 10% of the person's monthly income; or (3) the portion of welfare payments specifically designated for housing costs. NCR's president, Steve Bodkin, explained in his affidavit as follows:
[W]hile the market rate for all units at the Evening Star property was $389.00 per month in 2012, no tenants actually paid the market rate to rent a unit. Subsidies from the federal government are paid to NCR to cover the difference between the market rent and rent charged to each tenant.
*466 NCR also offered a list indicating, as of October 12, 2012, what each resident had paid in monthly rent and what HUD had paid each month for each apartment. The list indicated that most of the tenants paid between $100 and $200 per month in rent with HUD paying the remainder of the $389. A few of the residents were responsible for payments as low as $13 per month in rent. In those cases, the remaining $376 was paid to NCR by HUD.
NCR further offered evidence showing that it had a corporate policy "to maintain in residence any senior citizen resident who becomes unable to pay the regular charges if, after investigation, the Board of Trustees determines that said resident is without financial ability to pay." Relatedly, NCR's vice president, Steven A. Van Camp, testified in his affidavit as follows:
If a resident cannot pay his or her rent in a timely manner, NCR staff (including a federally funded service coordinator) will assist the resident in obtaining additional assistance. The assistance can be obtained through governmental agencies or non-profit organizations such as churches. If assistance cannot be obtained, NCR staff will work with the resident to formulate a reasonable payment plan. NCR does not and did not in 2012 or in 2013 charge any residents late fees if rent payments were late. Likewise, NCR did not evict any residents in 2012 or in 2013 for non-payment of rent.
In his affidavit, Bodkin also stated,
NCR also provides its tenants with an allowance to assist in meeting their electric utility obligations. If, in any given month, the allowance is more than the amount charged to a tenant for rent and electricity actually used, which occasionally happens, NCR tenders payment to the tenant for the difference that month. In other words, during some months, some NCR residents are actually paid to live in an air conditioned unit and take advantage of the free services that NCR has to offer to its residents.
Ultimately, the trial court granted HCAD's motion for summary judgment, and denied that of NCR. This appeal followed. In one issue, NCR challenges the trial court's summary-judgment rulings, contending that it is entitled to a property-tax exemption under Tax Code section 11.18(d)(13) for tax years 2012 and 2013.
Summary Judgment
A. Standard of Review & Rules of Construction
A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c) ; SeaBright Ins. Co. v. Lopez , 465 S.W.3d 637, 641 (Tex. 2015). When a plaintiff moves for summary judgment on its claim, it must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. Rhone-Poulenc, Inc. v. Steel , 997 S.W.2d 217, 223 (Tex. 1999) ; Anglo-Dutch Petroleum Int'l, Inc. v. Haskell , 193 S.W.3d 87, 95 (Tex. App.-Houston [1st Dist.] 2006, pet. denied). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. See City of Keller v. Wilson , 168 S.W.3d 802, 823 (Tex. 2005). Conversely, a defendant is entitled to summary judgment if it disproves at least one element of the plaintiff's cause of action as a matter of law. Doe v. Boys Clubs of Greater Dall., Inc. , 907 S.W.2d 472, 476-77 (Tex. 1995).
If a summary-judgment movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment.
*467 See Centeq Realty, Inc. v. Siegler , 899 S.W.2d 195, 197 (Tex. 1995) ; Goodyear Tire & Rubber Co. v. Mayes , 236 S.W.3d 754, 755 (Tex. 2007) (stating that summary-judgment evidence raises fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all evidence presented). We review summary-judgment evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. SeaBright Ins. Co. , 465 S.W.3d at 641.
When, as here, both sides move for summary judgment, and the trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. Id. at 641-42. We may consider evidence presented by both parties in determining whether to grant either motion. Expro Ams. LLC v. Sanguine Gas Exploration, LLC , 351 S.W.3d 915, 919 (Tex. App.-Houston [14th Dist.] 2011, pet. denied) (citing Knighton v. Int'l Bus. Machs. Corp. , 856 S.W.2d 206, 208-09 (Tex. App.-Houston [1st Dist.] 1993, writ denied) ; River Oaks Shopping Ctr. v. Pagan , 712 S.W.2d 190, 193 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) ).
"When both parties move for summary judgment, each party must carry its own burden, and neither can prevail because of the failure of the other to discharge its burden." BP Auto., L.P. v. RML Waxahachie Dodge, L.L.C. , 448 S.W.3d 562, 569 (Tex. App.-Houston [1st Dist.] 2014, no pet.) (citing Guynes v. Galveston Cty. , 861 S.W.2d 861, 862 (Tex. 1993) ).
At issue in the summary-judgment proceedings was whether NCR was entitled to a property-tax exemption under Tax Code section 11.18(d). Issues involving statutory construction are questions of law, which we review de novo. See R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water , 336 S.W.3d 619, 624 (Tex. 2011). When construing a statute, "our primary objective is to give effect to the Legislature's intent as expressed in the statute's language." Galbraith Eng'g Consultants, Inc. v. Pochucha , 290 S.W.3d 863, 867 (Tex. 2009). Words that are not defined are given their ordinary meaning unless a different meaning "is apparent from the context" or unless the ordinary meaning "leads to absurd results." Marks v. St. Luke's Episcopal Hosp. , 319 S.W.3d 658, 663 (Tex. 2010) ; see also Galbraith , 290 S.W.3d at 867 (stating that if "the words of a statute are clear and unambiguous, we apply them according to their plain and common meaning"). Courts "generally avoid construing individual provisions of a statute in isolation from the statute as a whole." Tex. Citizens , 336 S.W.3d at 628.
"Taxing statutes are construed strictly against the taxing authority and liberally for the taxpayer." Morris v. Hous. Indep. Sch. Dist. , 388 S.W.3d 310, 313 (Tex. 2012). In contrast, tax exemptions are strictly construed against the claimant. See Bullock v. Nat'l Bancshares Corp. , 584 S.W.2d 268, 271-72 (Tex. 1979). The claimant seeking an exemption "bears the burden of 'clearly showing' that it falls within the statutory exemption." Tex. Student Hous. Auth. v. Brazos Cty. Appraisal Dist. , 460 S.W.3d 137, 140-41 (Tex. 2015) (quoting N. Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist. , 804 S.W.2d 894, 899 (Tex. 1991) ).
B. Analysis
1. Texas Constitution Article VIII, Section 2 (a)
*468 NCR claims it is exempt from paying ad valorem taxes for tax years 2012 and 2013 under Texas Tax Code section 11.18(d)(13). See TEX. TAX CODE ANN. § 11.18(d)(13). However, before it can be considered for tax exempt status under Tax Code section 11.18, an organization must first meet the applicable state constitutional requirements entitling it to seek the exemption. N. Alamo Water Supply Corp. , 804 S.W.2d at 899. Here, the applicable state constitutional provision is Article 8, section 2(a), which provides that the legislature "may, by general laws, exempt from taxation ... institutions engaged primarily in public charitable functions, which may conduct auxiliary activities to support those charitable functions...." TEX. CONST. art. VIII, § 2 (a). Thus, before considering whether NCR meets the statutory provisions of Tax Code section 11.18(d), we must determine whether NCR demonstrated that it qualifies as an institution "engaged primarily in public charitable functions." See N. Alamo Water Supply Corp. , 804 S.W.2d at 899 ; see also TEX. CONST. art. VIII, § 2 (a).
Before 1999, section 2 (a) provided that "the legislature may, by general laws, exempt from taxation ... institutions of purely public charity [.]" N. Alamo Water Supply Corp. , 804 S.W.2d at 895 (citing former TEX. CONST. art. VIII, § 2 (a)). In 1999, section 2 (a) was amended, and the phrase an institution "engaged primarily in public charitable functions" replaced the phrase institutions "of purely public charity."[2] See Brazos Cty. Appraisal Dist. v. Bryan-College Station Reg'l Ass'n of Realtors, Inc. , 419 S.W.3d 462, 464 (Tex. App.-Waco 2013, pet. denied).
The 1999 analysis provided by the Texas Legislative Council indicated that section 2 (a) needed to be amended because the Supreme Court of Texas had construed the legislature's authority under the purely-public-charity language to grant exemptions from ad valorem taxation very narrowly. See TEX. LEG. COUNCIL , Analysis of Proposed Constitutional Amendments, November 2, 1999, Election , 109-110 (September 1999). The council noted that the supreme court had held "that the legislature may grant an exemption to a charitable organization only if the organization is organized and operated exclusively for charitable purposes and the property in question is used exclusively for those purposes." Id. The council explained that the amendment to section 2 (a) "substantially broadens the authority of the legislature to exempt from ad valorem taxation the property of charitable institutions." Id. at 110. "Under the proposed amendment, the legislature could exempt organizations that engage 'primarily,' rather than exclusively, in public charitable functions, even if those organizations conduct non-charitable auxiliary activities to support their charitable functions." Id.
The 1999 amendment did not change the essence of what constitutes a public charity or a public charitable function but instead provided the legislature with the ability to grant a tax exemption to a charity engaged in non-charitable auxiliary activities to support its public charitable function. Thus, to determine whether NCR's activity of providing housing to the elderly poor constitutes a public charitable function, we utilize the standard developed under former section 2(a). This standard *469 requires an organization to meet a three part test: (1) the organization must make no gain or profit; (2) it must be "organized to accomplish ends wholly benevolent by engaging in humanitarian services maintained to care for the physical or mental well-being of its recipients"; and (3) "[t]he total operation of the charity must affect all the people of a community or state by assuming, to a material extent, services which otherwise might devolve to and become the obligations of the community or state." N. Alamo Water Supply Corp. , 804 S.W.2d at 899 (citing City of McAllen v. Evangelical Lutheran Good Samaritan Soc'y , 530 S.W.2d 806, 810 (Tex. 1975) ; San Antonio Conservation Soc'y, Inc. v. City of San Antonio , 455 S.W.2d 743, 746 (Tex. 1970) ; City of Houston v. Scottish Rite Benevolent Ass'n , 111 Tex. 191, 230 S.W. 978, 981 (1921) ).
Applying the first factor, "[t]he law is well settled that the proscription against an institution's realization of 'gain or profit' refers to gain or profit by private individuals or the accrual of distributable profits." City of McAllen , 530 S.W.2d at 809. Here, the evidence showed that NCR is a section 501(c)(3) not-for-profit corporation. NCR's financial records, offered in support of summary judgment, indicate that NCR used its revenue to maintain and support the operation of the Property. See ids="10140828" index="34" url="https://cite.case.law/sw2d/530/806/#p810">id. ("[T]he fact that the net result of the Society's endeavors was the acquisition of profit, would not subject the organization to taxation because the profits were used for the permissible purposes of maintaining or expanding the Society's operations."). Thus, the uncontroverted summary-judgment evidence reflects that NCR did not make a gain or a profit from its operation.
With regard to the second factor, the evidence showed that NCR is "organized to accomplish ends wholly benevolent by engaging in humanitarian services maintained to care for the physical or mental well-being of its recipients." See N. Alamo Water Supply Corp. , 804 S.W.3d at 899; see also NHH-Canal St. Apts., Inc. v. Harris Cty. Appraisal Dist. , No. 14-14-00251-CV, 2015 WL 7306541, at *6 (Tex. App.-Houston [14th Dist.] Nov. 19, 2015, no pet.) (substitute mem. op.) (holding that housing facility for low-income elderly met constitutional and statutory requirements for tax exemption). In its financial statement, NCR avers that it "was incorporated as a non-stock, nonprofit charitable corporation for the purpose of operating a 62-unit apartment complex located in Alief, Texas for low-rent housing, particularly for the elderly or the infirm." NCR's articles of incorporation provide that it "shall have the power to provide elderly persons and handicapped persons with housing facilities and services specially designed to meet their physical, social, and psychological needs, and to promote their health, security, happiness, and usefulness in longer living."
A corporate resolution, passed by NCR's board of trustees in 1996, provides,
[NCR] has a long-standing corporate policy to maintain in residence any senior citizen resident who becomes unable to pay the regular charges if, after investigation, the Board of Trustees determines that said resident is without financial ability to pay.
This policy is limited only by financial constraints on the corporation. Financial assistance may be accomplished by: applying National Church Residences or the subsidiary's own resources; seeking funds from local and federal welfare units; soliciting funds from other organizations....
NCR offered evidence showing that it put into practice its stated corporate policies. The evidence shows that NCR rented *470 only to the "very low" or "extremely low" income elderly. NCR had no minimum income requirement to rent an apartment. None of the residents paid the full amount of rent at the Property with some residents paying as little as $13 per month.
NCR also offered uncontroverted evidence showing that, even though it has an eviction policy stated in its Tenant Selection Plan, it does not enforce the policy for non-payment of rent. Vice President Van Camp testified, "If a resident cannot pay his or her rent in a timely manner, NCR staff ... will assist the resident in obtaining additional assistance." He explained that "[t]he assistance can be obtained through governmental agencies or non-profit organizations such as churches." He stated that, "[i]f assistance cannot be obtained, NCR staff will work with the resident to formulate a reasonable payment plan." A resident list, dated October 12, 2012, submitted by NCR, indicated that a number of residents had negative account balances, ranging from a negative balance of $1.00 to $37.00. Van Camp confirmed that "NCR did not evict any residents in 2012 or in 2013 for non-payment of rent," and it did not charge late fees to the residents.
On appeal, HCAD argues that NCR did not meet the constitutional requirement for tax exemption because it receives monthly rental payments from its residents and subsidies from HUD. However, it is well settled that an institution will not be denied a property tax exemption as a public charity for the sole reason that it requires payment for the services rendered from those who are able to pay. See , e.g., City of McAllen , 530 S.W.2d at 808-09 (recognizing that organization's charging for nursing-home services was not determinative of whether it was entitled to property tax exemption); NHH-Canal St. Apts., Inc. , 2015 WL 7306541, at *4 (holding that low-income housing complex was entitled to property-tax exemption even though it charged rent and required tenants to have incomes greater than 1.5 times rental amount).
As recognized by one court, "An organization which provides housing, support or medical care for the elderly and infirm is not to be denied tax exemption merely because some, or even a majority, of its patients are able to pay for their own care." Dall. Cty. Appraisal Dist. v. The Leaves, Inc. , 742 S.W.2d 424, 427 (Tex. App.-Dallas 1987, writ denied). And, as explained in Santa Rosa Infirmary v. City of San Antonio , a case in which "[t]he funds required for the maintenance, upkeep, and improvement of the hospital facilities [were] derived solely from receipts from pay patients,"
The increase of charitable funds, through receipts from patients or inmates who are able to pay wholly or partially for benefits received, does not change a home for aged people, or hospital, organized and conducted as a charity, into a private association, maintained for the pecuniary advantage of the promoters. The original eleemosynary character of the institution is not transformed by this patronage, even if sufficient to relieve it from financial burdens, but the charity as established remains unaffected.
259 S.W. 926, 932 (Tex. Comm'n App. 1924, judgm't adopted) (internal quotation omitted).
In City of McAllen , the Supreme Court of Texas recognized that an organization's request for payment from a recipient of the service does not determine whether the organization is entitled to a property-tax exemption as a public charity. There, a non-profit organization, Evangelical Lutheran Good Samaritan Society ("the Society"), sought a property-tax exemption for *471 a nursing home it operated. City of McAllen , 530 S.W.2d at 808. The Society had "a policy to the effect that 'no person who applies for treatment or care is denied admission or once admitted is discharged because of poverty or riches, creed, station or color.' " Id. at 809. The court explained, however, that "a mere charter declaration of a worthwhile purpose will not make an institution one of purely public charity if it is not one in fact." Id. Instead, "[t]he question is whether the Society has, with its dedication of the McAllen home to charitable purposes, accompanied this by actual use in fact of the property for such purposes[.]" Id. The court determined that "[t]he above-cited open admissions policy appears to be one actively administered by the Society." Id. The court reached this determination based on the following:
Evidence presented at the trial reflected that although some compensation is received from all patients, either directly from paying patients or indirectly through welfare assistance, some 10 percent of the patients at the McAllen facility fail to pay the cost of their care. The evidence in the record that no one has ever been denied admission nor discharged because of inability to pay is uncontradicted.
Id.
Similarly, here, NCR presented evidence indicating that it implements its policy of "maintaining in residence any senior citizen resident who becomes unable to pay." Van Camp testified in his affidavit that, when a resident is unable to pay rent, NCR helps the resident in obtaining assistance from governmental agencies or non-profit organizations such as churches. If assistance cannot be found, NCR works with the tenant to maintain residency. Even though the evidence showed that a number of residents had negative account balances in October 2012, Van Camp confirmed that "NCR did not evict any residents in 2012 or in 2013 for non-payment of rent." This evidence was uncontradicted.
In City of McAllen , the taxing authority argued that the Society was not a purely public charity because its "policy [required] those who can pay [for the nursing-home services] to do so." Id. The supreme court disagreed, stating that "it is well settled that the fact that paying patients predominate over those unable to pay does not detract from the charitable nature of the service rendered." Id. at 810. The court continued,
Reliance upon percentages of paying patients versus non-paying patients, however, should not be the controlling factor. With the advent of present day social security and welfare programs, the traditional concept of charity, involving the extension of free services to the poor and alms-giving, will be rarely found since wide ranging assistance is available to the poor under such programs. Furthermore, the courts have defined charity to be something more than mere alms-giving or the relief of poverty and distress. The ultimate consideration then, should be based upon an evaluation of the total operation of the institution engaged in humanitarian activities whose services are rendered at cost or less and which are maintained to care for the physical and mental well-being of the recipients. By that total operation the institution must assume, to a material extent, that which otherwise might become the obligation or duty of the community or the state.
Id. (internal citations and quotation omitted). From this, it is apparent that, for purposes of determining entitlement to a property-tax exemption, an institution's charitable status is not determined by the source of the funds it receives; rather, it is the use to which the institution puts the *472 property and how it conducts its operations. Thus, HCAD's argument that NCR failed to establish that it is primarily engaged in a public charity function, because it receives rental payments directly from paying residents and indirectly from HUD, is without merit. See ids="10140828" index="49" url="https://cite.case.law/sw2d/530/806/#p810">id.
The summary-judgment evidence established that NCR uses the Property to provide low-cost housing to the elderly poor and continues to do so even when the resident is unable to pay his or her portion of the monthly rent. See ids="10140828" index="50" url="https://cite.case.law/sw2d/530/806/#p810">id. In short, NCR meets its burden to show that it is "organized to accomplish ends wholly benevolent by engaging in humanitarian services maintained to care for the physical or mental well-being of its recipients." N. Alamo Water Supply Corp. , 804 S.W.2d at 899 ; see also City of McAllen , 530 S.W.2d at 810.
In its brief, HCAD asserts that NCR did not meet the last constitutional requirement to establish that it had assumed, "to a material extent, that which otherwise might become the obligation or duty of the community or the state." N. Alamo Water Supply Corp. , 804 S.W.2d at 898 ; see also City of McAllen , 530 S.W.2d at 810 ("By [its] total operation the institution must assume, to a material extent, that which otherwise might become the obligation or duty of the community or the state."); cf. City of Amarillo v. Amarillo Lodge No. 731, A. F. & A. M. , 488 S.W.2d 69, 72 (Tex. 1972) (denying exemption because organization's activities did not "lighten any public burden"). HCAD argues that NCR has not shown that it assumed a burden that otherwise would fall on the government and its taxpayers because HUD pays a portion of the monthly market rent of $389. HCAD also points out that HUD provided funds to NCR in 1995 to initially develop the Property. HCAD emphasizes that the funds received from HUD are derived from taxpayers. For this reason, HCAD contends that NCR is not assuming what otherwise would fall on the state or the community. We disagree.
As discussed, NCR offered evidence showing that it did not evict a resident who was unable to pay his or her portion of the monthly rent for tax years 2012 and 2013. Instead, NCR aided the resident in finding financial assistance and maintained the tenant's residency at the Property. In this respect, NCR assumed a burden that would otherwise fall to the state or to the community.
But even more importantly, the community benefits from private entities, such as NCR, which take on the task of providing affordable housing for the low-income elderly. The great need for suitable housing for the elderly was recognized by Congress when it passed the National Housing Act:
The Congress finds that there is a large and growing need for suitable housing for older people both in urban and rural areas. Our older citizens face special problems in meeting their housing needs because of the prevalence of modest and limited incomes among the elderly, their difficulty in obtaining liberal long-term home mortgage credit, and their need for housing planned and designed to include features necessary to the safety and convenience of the occupants in a suitable neighborhood environment. The Congress further finds that the present programs for housing the elderly under the Department of Housing and Urban Development have proven the value of Federal credit assistance in this field and at the same time demonstrated the urgent need for an expanded and more comprehensive effort to meet our responsibilities to our senior citizens.
12 U.S.C.S. § 1701r (Lexis Nexis 2002).
The significance of providing affordable housing for persons of limited means was *473 reaffirmed in the Low-Income Housing Act:
(a) Declaration of policy
It is the policy of the United States-
(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this chapter-
(A) to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;
(B) to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and
(C) consistent with the objectives of this subchapter, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public;
(2) that the Federal Government cannot through its direct action alone provide for the housing of every American citizen, or even a majority of its citizens, but it is the responsibility of the Government to promote and protect the independent and collective actions of private citizens to develop housing and strengthen their own neighborhoods;
(3) that the Federal Government should act where there is a serious need that private citizens or groups cannot or are not addressing responsibly; and
(4) that our Nation should promote the goal of providing decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments, and by the independent and collective actions of private citizens, organizations, and the private sector.
42 U.S.C.S. § 1437 (Lexis Nexis 2000 & Supp. 2017). Although HUD provides funding to the Property, NCR actually bears the responsibility of implementing the federally funded low-income housing program, including managing and maintaining the physical facility. Without NCR's willingness to take on the actual work and responsibility of providing, managing, and maintaining a low-income facility to house the elderly poor, the burden would fall to the community and to the state.
A 1995 agreement signed by HUD and NCR, covering the funds HUD advanced to NCR to develop the Property, provides that NCR is not required to pay the funds back "so long as the housing remains available for very low-income elderly or very-low income persons with disabilities." This demonstrates that the government receives a benefit from NCR's act of providing housing to low-income elderly, and it shows that NCR lessens a burden that would otherwise need to be borne by the government at taxpayer expense. Thus, the summary-judgment evidence establishes that NCR assumed, "to a material extent, that which otherwise might become the obligation or duty of the community or the state." See N. Alamo Water Supply Corp. , 804 S.W.2d at 898.
We conclude that the uncontradicted summary-judgment evidence conclusively shows that, for tax years 2012 and 2013, NCR satisfied the state constitutional requirement of engaging primarily in public charitable function.[3] See *474 TEX. CONST. art. VIII, § 2 (a). Next, we turn to whether NCR is entitled to an exemption under the Tax Code.
2. Tax Code Section 11.18(d)(13)
NCR applied for a property-tax exemption under Tax Code section 11.18(d)(13), which provides as follows:
(d) A charitable organization must be organized exclusively to perform religious, charitable, scientific, literary, or educational purposes and, except as permitted by Subsections (h) and (l), engage exclusively in performing one or more of the following charitable functions:
....
(13) providing permanent housing and related social, health care, and educational facilities for persons who are 62 years of age or older without regard to the residents' ability to pay[.]
TEX. TAX CODE ANN. § 11.18(d)(13).
The point of contention between the parties is whether NCR conclusively showed that it provided housing without regard to its residents' ability to pay. We conclude that it did.
NCR's uncontradicted summary-judgment evidence showed that, to be eligible for housing at the Property, a prospective resident's annual income could not exceed certain income limits. Specifically, to be eligible for housing, a tenant was required to be in either the "very low" or "extremely low" income range. To be in the "very low" income category, yearly income could not exceed $23,200 for one person or $26,500 for two people. To be in the "extremely low" income category, yearly income was required not to exceed $13,900 for one person or $15,900 for two people. The evidence also established that there was no minimum income requirement to qualify for residency. And the evidence demonstrated that there was no minimum monthly payment that a resident was required to make. Instead, the amount of rent that a resident was directly responsible to pay was based on a percentage of the resident's "very low" or "extremely low" income, which had no minimum requirement. The evidence also showed that no resident paid the full monthly rent, with some residents paying as little as $13.00 per month. Thus, NCR's evidence conclusively established that it did not admit residents to the Property based on a resident's ability to pay. To the contrary, the evidence showed that a resident's admission was based on an inability to pay.
In addition, NCR's evidence demonstrated that a resident's continued tenancy at the Property was not dependent on his or her ability to pay. As discussed, NCR offered uncontradicted evidence showing that, should a resident be unable to meet his or her rental obligation, NCR offered assistance to the resident in finding financial aid. Even if financial aid could not be found, NCR maintained a tenant's residency. NCR's vice president testified that no resident was evicted or charged a late fee for nonpayment of rent in 2012 and 2013.
In response to NCR's motion for summary judgment and in support of its own motion, HCAD claimed that, for tax years 2012 and 2013, NCR did not provide housing to its residents without regard to the residents' ability to pay. HCAD asserted, "[NCR's] own documents expressly state that ... a security deposit is required in order to be eligible for housing." HCAD averred, "This conclusively negates the requirement that housing be provided 'without regard to the beneficiaries' ability to pay.' " HCAD offered NCR's published Tenant Selection Policy in support of its motion. The policy provides, "An application may be denied for any of the following *475 reasons: ... The applicant cannot pay the appropriate security deposit at move-in."
The Tenant Selection Policy further provides,
The applicant is required to pay the full security deposit at move-in. Security deposits are kept in an interest bearing account. Interest is paid or refunded in accordance with any state or local law. The security deposit is refundable barring any damage to the unit. The tenant forfeits the security deposit if they fail to give 30 day notice of move-out.
The amount of the security deposit that each resident must pay is determined by federal regulation. Pursuant to the regulation, each resident must pay a security deposit equal to the amount of the resident's monthly rent or $50, whichever is greater." The resident list indicated that each of NCR's residents had paid a security deposit of $50 or more as of October 12, 2012.
NCR takes the position that collection of a security deposit from its residents does not show that it did not provide housing without regard to the residents' ability to pay, as required to receive the tax exemption. We agree with NCR.
The HUD Policy Handbook, containing the policies and regulations applicable to NCR's property, addressed the topic of security deposits. The handbook provided that "[t]he tenant is expected to pay the security deposit from his/her own resources, and/or other public or private sources." It stated that "the security deposit is refundable" and, like the Tenant Selection Plan, required security deposits to be kept in separate, interest bearing accounts until refunded to the resident. The HUD Policy Handbook explained that "[s]ecurity deposits provide owners with some financial protection when a tenant moves out of the unit and fails to fulfill his/her obligations under the lease."
When read in the context of the governing HUD provisions, the security-deposit requirement is not an indicator of whether NCR failed to provide housing services without regard to its residents' ability to pay. As the context shows, a resident's ability to pay the deposit is not the focus of the security-deposit requirement. HUD's handbook provides that the one-time deposit may be paid by the resident or by a public or a private source. The handbook makes clear that the significance of the security deposit is to protect the landlord from any costs resulting from a tenant's breach of the lease. The security deposit remains in a separate interest-bearing account until the tenancy ends. Should the resident comply with the lease, the security deposit is then refunded to the resident along with accrued interest. In short, the evidence, taken together, indicates that the security deposit is a one-time administrative charge that has little bearing on whether NCR provides housing without regard to the residents' ability to pay.
We further note that, under HUD's rules, the amount of the deposit correlates to the resident's income, indicating that HUD sets the amount of the deposit at an amount that low-income persons have the ability to pay. Although the Tenant Selection Plan states that a prospective tenant may be rejected if the tenant cannot pay a security deposit at move-in, HCAD offered no evidence to show that NCR had rejected a prospective resident based on an inability to pay the security deposit. There was also no evidence that the payment of a security deposit posed an obstacle to low-income persons being accepted as residents at the Property, as demonstrated by the low-income status of the residents. See City of McAllen , 530 S.W.2d at 811 (holding that Society was entitled to property-tax exemption under predecessor statute *476 to section 11.18, which required facility to provide its benefits without regard to "poverty or riches" of the recipient, even though its admission procedure required "each prospective patient to obtain the signature of a 'responsible party' as part of the admission agreement"; court held such requirement did not pose an "impermissible obstacle to the admission of charity patients" "as seen by the high ratio of welfare patients" in nursing-home facility). We conclude that evidence showing that NCR required payment of a security deposit neither conclusively established that NCR considered a resident's ability to pay in providing housing nor did it raise a genuine issue of material fact.
HCAD also claims that NCR's Tenant Selection Plan "conclusively demonstrates that [NCR] does not provide housing 'without regard to the beneficiaries' ability to pay' because the plan provides that "[a]n applicant must agree to pay the rent required by the program under which the applicant will receive assistance." As discussed, courts have held charitable organizations were entitled to a property-tax exemption, even though the organization charged and received payment for its services. See , e.g., id. at 808-09 (holding that organization charging for nursing-home services was entitled to property tax exemption because "[t]he evidence in the record that no one has ever been denied admission nor discharged [from the nursing home] because of inability to pay is uncontradicted"); NHH-Canal St. Apts., Inc. , 2015 WL 7306541, at *4 (holding that NHH-Canal Street, which operated a low-income housing complex, was entitled to property-tax exemption under section 11.18(d)(2)'s "without regard to ability to pay language," even though it charged rent and had screening requirement that tenants have incomes of at least 1.5 times rental amount).
When placed in the context of the entire summary-judgment record, requiring a prospective resident to agree to pay a portion of the rent, neither conclusively establishes that NCR considered a resident's ability to pay nor defeats NCR's motion for summary judgment. Only residents who had a "very low" or "extremely low" income were permitted to live at the Property. No minimum income was required. No resident directly paid the full amount of the rent from his or her own funds. Some residents paid only $13 in monthly rent. NCR also provided its residents with monthly electric utility allowances, which at times, resulted in a net gain for a resident if the allowance exceeded the amount of rent and utilities charged to the resident.
HCAD also pointed out that NCR has an eviction policy that "relates directly to a tenant's ability to pay." HCAD asserted that the eviction policy showed that NCR had "affirmatively consider[ed] the ability to pay before accepting a tenant." NCR acknowledged that it had an eviction policy; however, it asserted that it did not enforce the policy. To counter HCAD's argument, NCR pointed to its corporate resolution, providing that "[NCR] has a long-standing corporate policy to maintain in residence any senior citizen resident who becomes unable to pay the regular charges if, after investigation, the Board of Trustees determines that said resident is without financial ability to pay."
NCR also provided Van Camp's uncontroverted affidavit testimony in which he stated that "If a resident cannot pay his or her rent in a timely manner, NCR staff ... will assist the resident in obtaining additional assistance." Van Camp testified that "NCR did not evict any residents in 2012 or in 2013 for non-payment of rent," nor did NCR charge any late fees during this period. In light of the evidence, we *477 agree with NCR that its eviction policy did not conclusively establish that NCR considered its residents' ability to pay when deciding whether to admit or to retain a resident; nor did it defeat NCR's motion for summary judgment.
We conclude that NCR has proven as a matter of law, not only that it meets the state constitutional requirement with respect to a property-tax exemption, but also that it provided housing to its residents without regard to the residents' ability to pay, satisfying Tax Code section 11.18(d)(13). In short, NCR has conclusively shown that it is entitled to a property-tax exemption for 2012 and 2013. We further conclude that HCAD did not present evidence raising a fact issue with regard to the ability-to-pay issue, nor did HCAD establish its right to summary judgment. We hold that the trial court erred when it granted HCAD's motion for summary judgment and denied NCR's motion.
We sustain NCR's sole issue.
Conclusion
We reverse the judgment of the trial court. We render judgment granting NCR's motion for summary judgment and denying HCAD's motion for summary judgment.

NCR also claimed that, as a charitable organization, it was entitled to a property-tax exemption under Tax Code Section 11.18(d)(3) because it "provid[ed] support without regard to the beneficiaries' ability to pay to ... elderly persons." Tex. Tax Code Ann. § 11.18(d)(3) (Vernon 2015). However, NCR did not assert this as a basis for an exemption in the application it filed with HCAD seeking an exemption.

In its brief, HCAD contends that NCR was not entitled to summary judgment because it referenced the former language of Section 2(a), instead of the current language. However, as it points out in its reply brief, NCR expressly asserted in its motion for summary judgment that it had conclusively established that it satisfied the constitutional requirements and had cited both the current and former constitutional language.

We note that, in its response to NCR's motion for summary judgment, HCAD did not respond to NCR's claim that it satisfied the state constitutional requirement.